385 F.Supp. 1332 (1974)
LACLEDE GAS COMPANY d/b/a Midwest Missouri Gas Company, Plaintiff,
v.
AMOCO OIL COMPANY, Defendant.
No. 73 C 436(3).
United States District Court, E. D. Missouri, E. D.
November 27, 1974.
*1333 M. E. Stokes and Paul B. Hunker, Jr., St. Louis, Mo., for plaintiff.
Coburn, Croft, Shepherd & Herzog, St. Louis, Mo., for defendant.

MEMORANDUM
WANGELIN, District Judge.
This action is before the Court for decision on the merits following the trial to the Court sitting without a jury.
Plaintiff, Laclede Gas Company (herein Laclede), brought this action seeking specific enforcement of a contract against defendant, Amoco Oil Company (herein Amoco). The Court being fully apprised of the premises hereby makes the following findings of fact and conclusions of law.

Findings of Fact
1. This Court has jurisdiction over the subject matter of this suit and the parties hereto pursuant to 28 U.S.C. § 1332.
2. Midwest Missouri Gas Company is now a division of Laclede Gas Company, a gas distribution utility engaged in the business of distributing natural gas and propane in the Eastern one-half of the State of Missouri, in the area from St. Louis to Butler County. Prior to September, 1970, Midwest Missouri Gas Company was a separate gas distribution company operating in an area which consisted of the Northern one-half of Jefferson County, Missouri. Defendant, Amoco Oil Company, formerly known as American Oil Company, is a company engaged in business operations which include the refining and sale of petroleum products, including propane, on a nationwide basis.
3. On September, 21, 1970, Midwest Missouri Gas Company (hereinafter referred to as Laclede) and Amoco entered into an Agreement, the purpose of which was to establish central propane distribution services for various subdivisions in the Northern one-half of Jefferson County, Missouri, until such time as it became feasible for Laclede to extend its natural gas distribution system to them. According to the terms of the Agreement, Amoco was to function in the capacity of a supplier and Laclede in the capacity of a distributing utility. The Agreement contemplated that the developers of residential subdivisions would make application to Laclede to furnish central propane distribution service before commencing construction. In this type of propane service, Laclede's distribution facilities (i. e., the mains and services) are placed underground in the same fashion as a natural gas distribution system. Laclede also furnishes each resident with a meter and regulator. The gas which services each subdivision is stored in metal tanks which have a capacity of one thousand gallons (1,000) each. Depending upon the size of the subdivision and the number of customers on the distribution system within the subdivision, any number of these tanks can be connected by piping so as to form an adequate reservoir in which to hold the propane gas for the system. Propane gas is normally transported and stored in a liquid form under pressure. It is vaporized as it leaves the tanks and enters the distribution system, and is used by the resident in his gas appliances used for cooking, home heating and hot water.
4. Under the Agreement, when a developer of a subdivision made application to Laclede for central propane distribution service, Laclede would determine the feasibility of furnishing such service. If feasible, Laclede would request *1334 in writing that Amoco accept the proposed subdivision for propane service to the extent of the number of residential units mentioned in Laclede's written request. Upon the acceptance by Amoco, in writing, Laclede would confirm with the developer that the residents of the subdivision would be furnished central propane service as utility customers. It was Amoco's obligation, upon acceptance of a subdivision by this supplemental letter agreement, to acquire the sites suitable to both parties for the location of the required storage and vaporization facilities. Amoco was to install, own, maintain and operate those and any other facilities necessary and "adequate to provide a continuous supply" of propane, which included the delivery of propane into the storage tanks in volumes sufficient to meet the needs of the customers within the subdivision. Laclede was obliged to acquire easements and other rights at the installation of its distribution facilities, and to install, own, maintain and operate said distribution facilities within the subdivision. The title to the gas would pass from Amoco to Laclede at the outlet of the Amoco header piping. The Agreement required each party to be responsible for certain other aspects of the operation of the central propane distribution systems, required the facilities to meet certain technical standards and contained an indemnity agreement. The Agreement was to remain in effect until conversion of all the systems to natural gas. There were provisions for termination of the agreement upon the happening of certain events, but those provisions were never invoked.
5. By supplementary agreements between Laclede and Amoco, the Agreement in suit was made applicable to some seventeen (17) residential subdivisions in Jefferson County, Missouri. Amoco sold and delivered propane which Laclede distributed to the residents of said subdivisions for domestic use. In the case of several subdivisions, Amoco ceased delivering propane to a subdivision when notified by Laclede that Laclede had converted the subdivision from propane to natural gas. The subdivision, Laura Acres, was cancelled by Laclede because the developer had obtained another supplier. In the case of West Elm, when the developer did not prepare a site for Amoco's tanks, residents found another supplier of propane. Later when Laclede converted the subdivision to natural gas, it cancelled the Agreement with Amoco so far as West Elm was concerned. Laclede cancelled the Agreement in the case of Bear Creek because the developer did not complete the subdivision.
6. The first delivery of propane by Amoco to Laclede within the meaning of the Agreement occurred on September 21, 1970.
7. Amoco served notice on Laclede on May 14, 1973 to terminate the Agreement as of May 31, 1973.
8. Amoco delivered propane to Laclede under the Agreement from September 21, 1970 to May 31, 1973.
9. Beginning June 1, 1973 Laclede began supplying the subdivisions in Jefferson County with propane purchased by Laclede from Phillips Petroleum Corporation (herein Phillips) under a supply contract entered into by Laclede with Phillips on April 1, 1972, and delivery to the storage tanks at the subdivisions was made by trucks of the O'Fallon Gas Company pursuant to arrangements made by Laclede.
10. At this time there are eight subdivisions in Jefferson County where Laclede is distributing propane to householders. The federal government established a mandatory program for the allocation of propane on October 2, 1973 which is still in effect. This program was revised on January 15, 1974. Pursuant to this program as revised, and on February 1, 1974, Amoco began delivering propane to Laclede to supply the subdivisions in Jefferson County and is continuing to do so at present. These deliveries were not made pursuant to the Agreement in suit.
11. At the time of this lawsuit Laclede had a storage capacity for propane *1335 of approximately Thirty-Three Thousand Five Hundred Gallons (33,500). In addition it has a supply contract with Phillips under which Laclede may buy up to Forty-Five Million Gallons (45,000,000) of propane annually, Thirty Million Gallons (30,000,000) during the Winter months and Fifteen Million Gallons (15,000,000) during the Summer months. Laclede is required to designate the amount of propane which it will purchase during the forthcoming Winter months and the forthcoming Summer months on or before April 1st of each year. Laclede has never purchased the maximum amount of propane permitted under the Phillips' contract and before April 1, 1974 it designated only Twenty Million Gallons (20,000,000) for purchase during the Winter months and Two Hundred Fifty Thousand Gallons (250,000) during the Summer months for a total of Twenty Million Two Hundred Fifty Thousand (20,250,000) Gallons for this contract year. Further, Laclede has a supply contract with Continental Oil Company, entered into on September 21, 1970, under which Laclede can buy up to Six Million Gallons (6,000,000) of propane during the Winter months and Eighteen Million Six Hundred Thousand Gallons (18,600,000) annually. Laclede is required to designate before April 1st of each year the amount it will purchase during the following Summer months, but no designation is required for purchases during the Winter months. Prior to April 1, 1974, Laclede designated only Two Million Gallons (2,000,000) for purchase during this Summer and still has the ability to purchase Six Million Gallons (6,000,000) during this Winter. During the last year Laclede distributed approximately Four Hundred Thousand Gallons (400,000) of propane to the Jefferson County Subdivisions and it estimates that it will not distribute more than Six Hundred Thousand Gallons (600,000) during the forthcoming year. Laclede has been distributing propane to a subdivision in St. Louis County which it purchases from Phillips under the supply contract above mentioned in the amount of approximately Seven Hundred Thousand Gallons (700,000) annually.
12. The maximum amount of propane (approximately Four Hundred Thousand Gallons (400,000) purchased by Laclede for the Jefferson County Subdivisions during the last year is only .00888% of the Forty-Five Million Gallons (45,000,000) that Laclede can buy annually from Phillips. The Six Hundred Thousand Gallons (600,000) which Laclede estimates it will not exceed for the coming year is only .0133% of the amount that it can purchase during the same time from Phillips. The Seven Hundred Thousand Gallons (700,000) that Laclede has been distributing to the St. Louis County Subdivision from propane obtained under the Phillips' supply contract exceeds both Laclede's Jefferson County requirements of last year and its projected requirements for the forthcoming year. Under the Phillips' contract Laclede could have designated before April 1, 1974 the Six Hundred Thousand Gallons (600,000) that Laclede estimates will be the maximum amount that it will need to service the Jefferson County Subdivisions during the forthcoming year.
13. At the present time, Amoco is able to supply Laclede with its full requirements in Jefferson County; and Phillips and Conoco are supplying Laclede with 100% of their obligations under their respective contracts. Nationwide the inventory of propane is 77.8% higher than at a similar time in 1973.
14. Under the Agreement in suit Laclede is not obliged to buy any propane from Amoco.
15. Under the Agreement in suit Amoco has no right to compel Laclede to perform any obligations under this Agreement. The Agreement in suit is incomplete, indefinite, and vague.
16. The Agreement in suit is for an indefinite term.
17. Under the terms of the Agreement, the same shall automatically continue in effect for additional periods of *1336 one year but Laclede can, with or without reason, terminate the Agreement by giving Amoco 30 days notice prior to the expiration of any contract-year; Amoco has no such right of termination.
18. On or about April 2, 1973 Amoco increased the Wood River Posted Price for propane and on April 16, 1973 Laclede challenged that price increase claiming that the Agreement provided for the payment by Laclede of an area Wood River Posted Price of all Wood River suppliers and not Amoco's Wood River Posted Price.

Conclusions of Law
This entire controversy turns upon one significant factor. Does Laclede's right to arbitrarily cancel the Agreement in suit by giving Amoco thirty days notice prior to the expiration of any contract-year, without Amoco having a similar right, make the Agreement void for lack of mutuality?
The general rule of law regarding such cancellation rights is:
Where there is no sufficient consideration to support the contract other than the mutual promises of the parties, ordinarily a contract which one party has an absolute and unrestricted right to cancel or terminate at any time . . . is invalid and unenforceable for lack of mutuality, at least to the extent that it remains executory. 17 C.J.S. Contracts § 100(6).
The law in Missouri is in accord with the above stated theory. Cooper v. Jensen, 448 S.W.2d 308, 314 (Mo.Ct. of Appeals, 1969).
In the case at bar the evidence proved that while there were small amounts of mutual consideration between the parties the consideration was not of a sufficient quality nor quantity to act as a pallative for Amoco to swallow the bitter pill of Laclede's arbitrary and unbridled right of cancellation. As Judge Hulen of the Eastern District of Missouri stated in Boland v. Shell Oil Company, 71 F.Supp. 649 (D.C., 1947), "[the question of] mutuality presents a close question". After a close and careful review of the evidence presented to this Court, this Court can come to no other conclusion than that the Agreement in question lacked sufficient consideration for Laclede's cancellation privileges so that the entire Agreement in suit was unenforceable as to its executory portions.
As the Eighth Circuit stated:
. . . where the arbitrary and unrestricted right of cancellation is reserved to one or both parties, contracts like the one here are binding only to the extent that they have been performed. Bendix Home Appliances v. Radio Accessories Company, 129 F. 2d 177, 181 (8th Cir., 1942); accord, Cooper v. Jensen, supra.
Since the case law and precedents cited above make it clear that the Agreement in suit is invalid due to a lack of mutuality because of plaintiff Laclede's unilateral right of cancellation, the other points upon which defendant Amoco seeks to void the Agreement will not be dealt with. Since the contract is invalid due to lack of mutuality, Laclede's prayer for injunctive relief as to Count I of Laclede's amended complaint will be denied.
Count II of plaintiff's first amended complaint seeks damages for alleged breach of the Agreement after May 31, 1973. No decision on the merits of that Count will be reached herein.
Accordingly, judgment for the defendant will be entered as to Count I of the Amended Complaint.