LACLEDE GAS COMPANY, doing business as Midwest Missouri Gas Company, Plaintiff-Appellant,

v.

AMOCO OIL COMPANY, Defendant-Appellee.

No. 74–1957.

United States Court of Appeals, Eighth Circuit.

Submitted May 13, 1975.

Decided July 10, 1975.

Morris E. Stokes and P. B. Hunker, Jr., Laclede Gas Co., St. Louis, Mo., for plaintiff-appellant.

Richmond C. Coburn, St. Louis, Mo., for defendant-appellee.

Before LAY, ROSS and WEBSTER, Circuit Judges.

ROSS, Circuit Judge.

The Laclede Gas Company (Laclede), a Missouri corporation, brought this diversity action alleging breach of contract against the Amoco Oil Company (Amoco), a Delaware corporation. It sought relief in the form of a mandatory injunction prohibiting the continuing breach or, in the alternative, damages. The district court held a bench trial on the issues of whether there was a valid, binding contract between the parties and whether, if there was such a contract, Amoco should be enjoined from breaching it. It then ruled that the "contract is invalid due to lack of mutuality" and denied the prayer for injunctive relief. The court made no decision regarding the requested damages. *Laclede Gas Co. v. Amoco Oil Co.*, 385 F.Supp. 1332, 1336 (E.D.Mo.1974). This appeal followed, and we reverse the district court's judgment.

On September 21, 1970, Midwest Missouri Gas Company (now Laclede), and American Oil Company (now Amoco), the predecessors of the parties to this litigation, entered into a written agreement which was designed to provide central propane gas distribution systems to various residential developments in Jefferson County, Missouri, until such time as natural gas mains were extended into these areas. The agreement contemplated that as individual developments were planned the owners or developers would apply to Laclede for central propane gas systems. If Laclede determined that such a system was appropriate in any given development, it could request Amoco to supply the propane to that specific development. This request was made in the form of a supplemental form letter, as provided in the September 21 agreement; and if Amoco decided to supply the propane, it bound itself to do so by signing this supplemental form.

Once this supplemental form was signed the agreement placed certain duties on both Laclede and Amoco. Basically, Amoco was to "[i]nstall, own, maintain and operate . . . storage and vaporization facilities and any other facilities necessary to provide [it] with the capability of delivering to [Laclede] commercial propane gas suitable . . . for delivery by [Laclede] to its customers' facilities." Amoco's facilities were to be "adequate to provide a continuous supply of commercial propane gas at such times and in such volumes commensurate with [Laclede's] requirements for meeting the demands reasonably to be anticipated in each Development while this Agreement is in force." Amoco was deemed to be "the supplier," while Laclede was "the distributing utility."

For its part Laclede agreed to "[i]nstall, own, maintain and operate all distribution facilities" from a "point of delivery" which was defined to be "the

outlet of [Amoco] header piping." Laclede also promised to pay Amoco "the Wood River Area Posted Price for propane plus four cents per gallon for all amounts of commercial propane gas delivered" to it under the agreement.

Since it was contemplated that the individual propane systems would eventually be converted to natural gas, one paragraph of the agreement provided that Laclede should give Amoco 30 days written notice of this event, after which the agreement would no longer be binding for the converted development.

Another paragraph gave Laclede the right to cancel the agreement. However, this right was expressed in the following language:

This Agreement shall remain in effect for one (1) year following the first delivery of gas by [Amoco] to [Laclede] hereunder. Subject to termination as provided in Paragraph 11 hereof [dealing with conversions to natural gas], this Agreement shall automatically continue in effect for additional periods of one (1) year each unless [Laclede] shall, not less than 30 days prior to the expiration of the initial one (1) year period or any subsequent one (1) year period, give [Amoco] written notice of termination.

There was no provision under which Amoco could cancel the agreement.

For a time the parties operated satisfactorily under this agreement, and some 17 residential subdivisions were brought within it by supplemental letters. However, for various reasons, including conversion to natural gas, the number of developments under the agreement had shrunk to eight by the time of trial. These were all mobile home parks.

During the winter of 1972–73 Amoco experienced a shortage of propane and voluntarily placed all of its customers, including Laclede, on an 80% allocation basis, meaning that Laclede would receive only up to 80% of its previous requirements. Laclede objected to this and pushed Amoco to give it 100% of what the developments needed. Some conflict arose over this before the temporary shortage was alleviated.

Then, on April 3, 1973, Amoco notified Laclede that its Wood River Area Posted Price of propane had been increased by three cents per gallon. Laclede objected to this increase also and demanded a full explanation. None was forthcoming. Instead Amoco merely sent a letter dated May 14, 1973, informing Laclede that it was "terminating" the September 21, 1970, agreement effective May 31, 1973. It claimed it had the right to do this because "the Agreement lacks 'mutuality.'"[1]

The district court felt that the entire controversy turned on whether or not Laclede's right to "arbitrarily cancel the Agreement" without Amoco having a similar right rendered the contract void "for lack of mutuality" and it resolved this question in the affirmative. We disagree with this conclusion and hold that settled principles of contract law require a reversal.

## I.

■ A bilateral contract is not rendered invalid and unenforceable merely because one party has the right to cancellation while the other does not. There is no necessity "that for each stipulation in a contract binding the one party there must be a corresponding stipulation binding the other." *James B. Berry's Sons Co. v. Monark Gasoline & Oil Co.*, 32 F.2d 74, 75 (8th Cir. 1929). *Accord, Boland v. Shell Oil Co.*, 71 F.Supp. 649, 651 (E.D.Mo.1947) (Missouri law); *Zeppenfeld v. Morgan*, 168 S.W.2d 971, 975 (Mo.Ct.App.1943); *Banner Creamery Co. v. Judy*, 47 S.W.2d 129, 131 (Mo.App.1932).

■ The important question in the instant case is whether Laclede's right of

---

1. While Amoco sought to repudiate the agreement, it resumed supplying propane to the subdivisions on February 1, 1974, under the mandatory allocation guidelines promulgated by the Federal Energy Administration under the Federal Mandatory Allocation Program for propane. It is agreed that this is now being done under the contract.

cancellation rendered all its other promises in the agreement illusory so that there was a complete *failure* of consideration. This would be the result had Laclede retained the right of immediate cancellation at any time for any reason. 1 S. Williston, Law of Contracts § 104, at 400–401 (3d ed. 1957). However, Professor Williston goes on to note:

> Since the courts . . . do not favor arbitrary cancellation clauses, the tendency is to interpret even a slight restriction on the exercise of the right of cancellation as constituting such legal detriment as will satisfy the requirement of sufficient consideration; for example, where the reservation of right to cancel is for cause, or by written notice, or after a definite period of notice, or upon the occurrence of some extrinsic event, or is based on some other objective standard.

*Id.* § 105, at 418–419 (footnotes omitted). Professor Corbin agrees and states simply that when one party has the power to cancel by notice given for some stated period of time, "the contract should never be held to be rendered invalid thereby for lack of 'mutuality' or for lack of consideration." 1A A. Corbin, Corbin on Contracts § 164 at 83 (1963). The law of Missouri appears to be in conformity with this general contract rule that a cancellation clause will invalidate a contract only if its exercise is *unrestricted.* *Phillips Petroleum Co. v. Rau Const. Co.,* 130 F.2d 499, 501 (8th Cir.), *cert. denied,* 317 U.S. 685, 63 S.Ct. 260, 87 L.Ed. 549 (1942), (Missouri law); *Boland v. Shell Oil Co., supra,* 71 F.Supp. at 651–652; *Bevins v. Harris,* 380 S.W.2d 345, 352 (Mo.1964); *National Refining Co. v. Cox,* 227 Mo.App. 778, 57 S.W.2d 778, 781 (1933).

Here Laclede's right to terminate was neither arbitrary nor unrestricted. It was limited by the agreement in at least three ways. First, Laclede could not cancel until one year had passed after the first delivery of propane by Amoco. Second, any cancellation could be effective only on the anniversary date of the first delivery under the agreement. Third, Laclede had to give Amoco 30 days written notice of termination. These restrictions on Laclede's power to cancel clearly bring this case within the rule.

 A more difficult issue in this case is whether or not the contract fails for lack of "mutuality of consideration" because Laclede did not expressly bind itself to order all of its propane requirements for the Jefferson County subdivisions from Amoco.

While there is much confusion over the meaning of the terms "mutuality" or "mutuality of obligation" as used by the courts in describing contracts, 1 S. Williston, *supra,* § 105A, at 420–421; 1A A. Corbin, *supra,* § 152, at 2–3, our use of this concept here is best described by Professor Williston:

> Sometimes the question involved where mutuality is discussed is whether one party to the transaction can by fair implication be regarded as making any promise; but this is simply an inquiry whether there is consideration for the other party's promise.

1 S. Williston, *supra,* § 105A, at 423. (Footnote omitted.) As stated by the Missouri Supreme Court:

> Mutuality of contract means that an obligation rests upon each party to do or permit to be done *something in consideration* of the act or promise of the other; that is, neither party is bound unless both are bound.

*Aden v. Dalton,* 341 Mo. 454, 107 S.W.2d 1070, 1073 (1937), *quoting Gillen v. Bayfield,* 329 Mo. 681, 46 S.W.2d 571, 575 (1935). (Emphasis supplied.) *See Middleton v. Holecroft,* 270 S.W.2d 90, 92 (Mo.App.1954).

We are satisfied that, while Laclede did not expressly promise to purchase all the propane requirements for the subdivisions from Amoco, a practical reading of the contract provisions reveals that this was clearly the intent of the parties. In making this determination we are mindful of three pertinent rules of contract law. First, the contract herein

**38**

consisted of both the September 21, 1970, agreement and the supplemental letter agreements, for a contract may be made up of several documents. *State ex rel. Foster v. Griffin*, 246 S.W.2d 396, 398 (Mo.App.1952). Second, "the consideration for a contract will not be held uncertain if by the application of the usual tests of construction, the court can reasonably discover to what the parties agreed." *Burger v. City of Springfield*, 323 S.W.2d 777, 783 (Mo.1959). Finally, "[w]here an agreement is susceptible of two constructions, one of which renders the contract invalid and the other sustains its validity, the latter construction is preferred." *Perbal v. Dazor Manufacturing Corp.*, 436 S.W.2d 677, 689 (Mo. 1968).

Once Amoco had signed the supplemental letter agreement, thereby making the September 21 agreement applicable to any given Jefferson County development, it was bound to be the propane supplier for that subdivision and to provide a continuous supply of the gas sufficient to meet Laclede's reasonably anticipated needs for that development. It was to perform these duties until the agreement was cancelled by Laclede or until natural gas distribution was extended to the development.[2]

For its part, Laclede bound itself to purchase all the propane required by the particular development from Amoco. This commitment was not expressly written out, but it necessarily follows from an intelligent, practical reading of the agreement.

Laclede was to "[i]nstall, own, maintain and operate all distribution facilities from the point of delivery as defined in Paragraph 3(b) . . . ." Paragraph 3(b) provided: "the point of delivery shall be at the outlet of [Amoco] header piping." Also under Paragraph 3(b) Amoco was to own and operate all the facilities on the bulk side of that header piping. Laclede thus bound itself to buy all its requirements from Amoco by

agreeing to attach its distribution lines to Amoco's header piping; and even if a change of suppliers could be made under the contract, Laclede could not own and operate a separate distribution system hooked up to some other supplier's propane storage tanks without substantially altering the supply route to its distribution system or making a very substantial investment in its own storage equipment and site. As a practical matter, then, Laclede is bound to buy all the propane it distributes from Amoco in any subdivision to which the supplemental agreement applies and for which the distribution system has been established.

When analyzed in this manner, it can be seen that the contract herein is simply a so-called "requirements contract." Such contracts are routinely enforced by the courts where, as here, the needs of the purchaser are reasonably foreseeable and the time of performance is reasonably limited. *Cold Blast Transp. Co. v. Kansas City Bolt & Nut Co.*, 114 F. 77, 81 (8th Cir. 1902); *Great Eastern Oil Co. v. DeMert & Dougherty*, 350 Mo. 535, 166 S.W.2d 490, 493 (1942); *Cantrell v. Knight*, 72 S.W.2d 196, 199–200 (Mo.Ct. App.1934); 1 S. Williston, *supra*, § 104A; 1A A. Corbin, *supra*, § 156.

We conclude that there is mutuality of consideration within the terms of the agreement and hold that there is a valid, binding contract between the parties as to each of the developments for which supplemental letter agreements have been signed.

## II.

Since he found that there was no binding contract, the district judge did not have to deal with the question of whether or not to grant the injunction prayed for by Laclede. He simply denied this relief because there was no contract. *Laclede Gas Co. v. Amoco Oil Co., supra*, 385 F.Supp. at 1336.

Generally the determination of whether or not to order specific per-

**2.** The evidence indicates that Laclede contemplates converting all of the subdivisions within 10 to 15 years, although it could not and would not commit itself to this timeframe.

formance of a contract lies within the sound discretion of the trial court. *Landau v. St. Louis Public Service Co.*, 364 Mo. 1134, 273 S.W.2d 255, 259 (1954). However, this discretion is, in fact, quite limited; and it is said that when certain equitable rules have been met and the contract is fair and plain "specific performance goes as a matter of right." *Miller v. Coffeen*, 365 Mo. 204, 280 S.W.2d 100, 102 (1955), *quoting, Berberet v. Myers*, 240 Mo. 58, 77, 144 S.W. 824, 830 (1912). (Emphasis omitted.)

With this in mind we have carefully reviewed the very complete record on appeal and conclude that the trial court should grant the injunctive relief prayed. We are satisfied that this case falls within that category in which specific performance should be ordered as a matter of right. *See Miller v. Coffeen, supra*, 280 S.W.2d at 102.

Amoco contends that four of the requirements for specific performance have not been met. Its claims are: (1) there is no mutuality of remedy in the contract; (2) the remedy of specific performance would be difficult for the court to administer without constant and long-continued supervision; (3) the contract is indefinite and uncertain; and (4) the remedy at law available to Laclede is adequate. The first three contentions have little or no merit and do not detain us for long.

There is simply no requirement in the law that both parties be mutually entitled to the remedy of specific performance in order that one of them be given that remedy by the court. *Beets v. Tyler*, 365 Mo. 895, 290 S.W.2d 76, 80 (1956); *Rice v. Griffith*, 349 Mo. 373, 161 S.W.2d 220, 225 (1942).

While a court may refuse to grant specific performance where such a decree would require constant and long-continued court supervision, this is merely a discretionary rule of decision which is frequently ignored when the public in-

terest is involved. *See, e. g., Joy v. St. Louis*, 138 U.S. 1, 47, 11 S.Ct. 243, 34 L.Ed. 843 (1891); *Western Union Telegraph Co. v. Pennsylvania Co.*, 129 F. 849, 869 (3d Cir. 1904); *Municipal Gas Co. v. Lone Star Gas Co.*, 259 S.W. 684, 690–691 (Tex.Civ.App.1924), *aff'd*, 117 Tex. 331, 3 S.W.2d 790 (1928).

Here the public interest in providing propane to the retail customers is manifest, while any supervision required will be far from onerous.

Section 370 of the Restatement of Contracts (1932) provides:

Specific enforcement will not be decreed unless the terms of the contract are so expressed that the court can determine with reasonable certainty what is the duty of each party and the conditions under which performance is due.

We believe these criteria have been satisfied here. As discussed in part I of this opinion, as to all developments for which a supplemental agreement has been signed, Amoco is to supply all the propane which is reasonably foreseeably required, while Laclede is to purchase the required propane from Amoco and pay the contract price therefor. The parties have disagreed over what is meant by "Wood River Area Posted Price" in the agreement, but the district court can and should determine with reasonable certainty what the parties intended by this term and should mold its decree, if necessary accordingly.[3] Likewise, the fact that the agreement does not have a definite time of duration is not fatal since the evidence established that the last subdivision should be converted to natural gas in 10 to 15 years. This sets a reasonable time limit on performance and the district court can and should mold the final decree to reflect this testimony.

It is axiomatic that specific performance will not be ordered when the party claiming breach of contract has an

---

3. The record indicates that Laclede has now accepted Amoco's interpretation and has agreed that "Wood River Area Posted Price" means Amoco's posted price for propane at its Wood River refinery.

adequate remedy at law. *Jamison Coal & Coke Co. v. Goltra*, 143 F.2d 889, 894 (8th Cir.), *cert. denied*, 323 U.S. 769, 65 S.Ct. 122, 89 L.Ed. 615 (1944). This is especially true when the contract involves personal property as distinguished from real estate.

■■■■■ However, in Missouri, as elsewhere, specific performance may be ordered even though personalty is involved in the "proper circumstances." Mo.Rev. Stat. § 400.2–716(1); Restatement of Contracts, *supra*, § 361. And a remedy at law adequate to defeat the grant of specific performance "must be as certain, prompt, complete, and efficient to attain the ends of justice as a decree of specific performance." *National Marking Mach. Co. v. Triumph Mfg. Co.*, 13 F.2d 6, 9 (8th Cir. 1926). *Accord, Snip v. City of Lamar*, 239 Mo.App. 824, 201 S.W.2d 790, 798 (1947).

One of the leading Missouri cases allowing specific performance of a contract relating to personalty because the remedy at law was inadequate is *Boeving v. Vandover*, 240 Mo.App. 117, 218 S.W.2d 175, 178 (1949). In that case the plaintiff sought specific performance of a contract in which the defendant had promised to sell him an automobile. At that time (near the end of and shortly after World War II) new cars were hard to come by, and the court held that specific performance was a proper remedy since a new car "could not be obtained elsewhere except at considerable expense, trouble or loss, which cannot be estimated in advance."

We are satisfied that Laclede has brought itself within this practical approach taken by the Missouri courts. As Amoco points out, Laclede has propane immediately available to it under other contracts with other suppliers. And the evidence indicates that at the present time propane is readily available on the open market. However, this analysis ignores the fact that the contract involved in this lawsuit is for a long-term supply of propane to these subdivisions. The other two contracts under which Laclede obtains the gas will remain in force only until March 31, 1977, and April 1, 1981, respectively; and there is no assurance that Laclede will be able to receive any propane under them after that time. Also it is unclear as to whether or not Laclede can use the propane obtained under these contracts to supply the Jefferson County subdivisions, since they were originally entered into to provide Laclede with propane with which to "shave" its natural gas supply during peak demand periods.[4] Additionally, there was uncontradicted expert testimony that Laclede probably could not find another supplier of propane willing to enter into a long-term contract such as the Amoco agreement, given the uncertain future of worldwide energy supplies. And, even if Laclede could obtain supplies of propane for the affected developments through its present contracts or newly negotiated ones, it would still face considerable expense and trouble which cannot be estimated in advance in making arrangements for its distribution to the subdivisions.

■■■■ Specific performance is the proper remedy in this situation, and it should be granted by the district court.[5]

## CONCLUSION

For the foregoing reasons the judgment of the district court is reversed and the cause is remanded for the fashioning of appropriate injunctive relief in the form of a decree of specific performance

---

4. During periods of cold weather, when demand is high, Laclede does not receive enough natural gas to meet all this demand. It, therefore, adds propane to the natural gas it places in its distribution system. This practice is called "peak shaving."

5. In fashioning its decree the district court must take into account any relevant rules and regulations promulgated under the Federal Mandatory Allocation Program.

as to those developments for which a supplemental agreement form has been signed by the parties.