756 F.2d 191
 244 U.S.App.D.C. 170
 ATLANTA GAS LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Alabama Gas Corporation, Carolina Pipeline Company, South
Carolina Electric & Gas, Chattanooga Gas Company, Southern
Natural Gas Company, Mississippi Valley Gas Company, Nipro,
Inc., et al., Georgia Industrial Group, Intervenors.
 No. 82-2231.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 4, 1983.
Decided March 15, 1985.
 
 Petition for Review of an Order of the Federal Energy Regulatory commission.
 John E. Holtzinger, Jr., Washington, D.C., with whom Paul H. Keck and John T. Stough, Jr., Washington, D.C., were on brief, for petitioner.
 Joel M. Cockrell, F.E.R.C., Washington, D.C., with whom Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., was on brief, for respondent. Joshua Z. Rokach, Washington, D.C., also entered an appearance for respondent.
 
 
 1
 James J. Flood, Jr., Washington, D.C., with whom William A. Major, Jr. and Roy R. Robertson, Jr., Birmingham, Ala., were on brief, for intervenor Southern Nat. Gas Co.
 
 
 2
 Harold L. Talisman, Michael J. MacDonald and Barbara J. Klein, Washington, D.C., were on brief, for intervenor Ala. Gas Corp.
 
 
 3
 Stanley M. Morley, Joel F. Zipp and Paul W. Diehl, Washington, D.C., were on brief, for intervenors Carolina Pipeline Co. and S.C. Elec. & Gas Co.
 
 
 4
 Fred K. Harvey, Augusta, Ga., entered an appearance for intervenors Nipro, Inc., et al.
 
 
 5
 Glenn W. Letham, Washington, D.C., entered an appearance for intervenor Chattanooga Gas Co.
 
 
 6
 John M. Kuykendall, Jr. and J. Michael Marcoux, Washington, D.C., entered appearances for intervenor Miss. Valley Gas Co.
 
 
 7
 Edward J. Grenier, Jr., Richard P. Noland and Richard A. Oliver, Washington, D.C., entered appearances for intervenor Ga. Indus. Group.
 
 
 8
 Before BORK and SCALIA, Circuit Judges, and WILLIAMS,* Senior Judge of the United States District Court for the Central District of California.
 
 
 9
 Opinion for the Court filed by Circuit Judge SCALIA.
 
 
 10
 SCALIA, Circuit Judge.
 
 
 11
 Atlanta Gas Light Company petitions under 15 U.S.C. Sec. 3416(a)(4) for review of a Federal Energy Regulatory Commission order approving the curtailment plan of Southern Natural Gas Company--that is, its plan for distributing gas among its customers in times when it is unable to acquire sufficient supplies to cover all their orders. The principal issue on appeal is whether the portion of the plan limiting the preferential claim of statutorily prescribed priority users to the volume of gas which they had contracted for an absolute right to receive ("contract demand" gas) is consistent with Title IV of the Natural Gas Policy Act of 1978 ("NGPA"), 15 U.S.C. Secs. 3391-3394 (1982), and with Commission regulations.
 
 
 12
 * In 1973, Southern Natural Gas Company ("Southern") submitted to the Commission[1] a curtailment plan for its interstate pipeline system. The Commission approved an interim, modified version of the plan in its Opinion No. 747, Southern Natural Gas Co., Docket Nos. RP74-6 and RP72-74, Opinion and Order Prescribing Interim Curtailment Plan, 54 F.P.C. 2298 (1975). This version included a provision--encompassed in Sec. 9.7(1) of Southern's tariff--that limited the noncurtailment requirements of certain of Southern's priority customers to contract demand. Contract demand ("CD") is that quantity of gas which a customer has an unqualified contractual right (generally accompanied by a minimum contractual obligation ) to purchase. It generally comes at a higher cost per unit volume than its opposite, authorized overrun ("AO") gas, which a customer may elect to purchase and the pipeline is contractually bound to deliver only if and when available.
 
 
 13
 While court review of Opinion No. 747 (and of an opinion granting in part and denying in part rehearing, Opinion No. 747-B, Southern Natural Gas Co., Docket Nos. RP74-6 and RP72-74, Opinion and Order Granting Rehearing in Part and Denying Rehearing in Part, 55 F.P.C. 2358 (1976)) was pending, the parties, including all parties to the present action, reached a settlement adopting a permanent curtailment plan. The settlement restricted the application of the contract demand limitation to days when the forecast mean temperature fell to 48? F or below.[2] The Commission approved the settlement. Opinion No. 5, Southern Natural Gas Co., Docket Nos. RP74-6 and RP72-74, Opinion and Order Approving Settlement Prescribing Permanent Curtailment Plan, 1 F.E.R.C. (CCH) p 61,144 (1977).
 
 
 14
 One year later, Congress adopted the NGPA, Pub.L. No. 95-621, 92 Stat. 3351 (codified as amended at 15 U.S.C. Secs. 3301-3432 (1982)). Section 401 of the Act provides for an "end-use" priority distribution scheme under which several categories of users--primarily residential, small commercial, and essential agricultural users--receive preferential treatment in the event of gas shortages.[3] In Orders Nos. 29 and 29-C, the Commission adopted regulations implementing this section of the NGPA. Order No. 29, FERC Statutes and Regulations (CCH) p 30,053 (1979) (Final Regulation for the Implementation of Section 401 of the NGPA); Order No. 29-C, FERC Statutes and Regulations (CCH) p 30,092 (1979) (Final Amending Regulation for the Implementation of Section 401 of the NGPA). The regulation at issue here provides that "[a]ll deliveries to all customers of the interstate pipeline for all volumes of natural gas not included in priorities 1 and 2 shall be fully curtailed by the interstate pipeline before priorities 1 and 2 entitlements are curtailed." 18 C.F.R. Sec. 281.205(b) (1984).[4] The Commission also directed interstate pipelines to file tariff sheets bringing their curtailment plans into conformity with the Commission's rules. 18 C.F.R. Sec. 281.204(a).
 
 
 15
 On October 2, 1979, Southern responded by filing proposed tariffs in Commission Docket No. TC80-26. The proposed tariffs modified Southern's index of requirements to correspond to the new NGPA categories, but made no change in Sec. 9.7(1). Atlanta Gas Light Company ("Atlanta") protested Southern's filing, arguing that it violated Sec. 401 of the NGPA and Commission Orders No. 29 and No. 29-C. On October 31, 1979, the Commission accepted Southern's tariff sheets for filing, suspended them for five months, and ordered an expedited hearing. At the same time, the Commission noted that Southern had the option of seeking special relief pursuant to Sec. 502(c) of the NGPA, 15 U.S.C. Sec. 3412(c), which allows adjustment "as may be necessary to prevent special hardship, inequity, or an unfair distribution of burdens."
 
 
 16
 While not conceding that its filing was inconsistent with the Order No. 29 series, Southern thereafter withdrew the proposed tariffs and filed an adjustment application for special relief with the Director of the Office of Pipeline and Producer Regulation ("OPPR"), requesting that the same tariff sheets be permitted to become effective. In May 1980, the Director of OPPR issued an order granting Southern special relief on the ground that while Sec. 9.7(1) could result in gas deliveries to certain lower priority users in preference to higher priority users in violation of Order No. 29, any modification of the section would be unfair and reopen the years of litigation that resulted in the Opinion No. 5 settlement. Southern Natural Gas Co., Docket No. SA80-59, Order of the Director, Office of Pipeline and Producer Regulation, Granting Adjustment, 11 F.E.R.C. (CCH) p 62,124 (1980).
 
 
 17
 Atlanta and two other parties took an administrative appeal from the Director's order. In the meantime, the Commission permitted Southern's proposed tariff sheets to become effective. On September 23, 1981, after a two-day evidentiary hearing, the presiding officer found that the Director's order granting special relief was based on the erroneous assumption that Sec. 9.7(1) was inconsistent with Order No. 29. Southern Natural Gas Co., Docket No. SA80-59, Proposed Order of Presiding Officer, 16 F.E.R.C. (CCH) p 62,615 (1981) ("Proposed Order"). The presiding officer concluded instead that the priority entitlements designated by the Commission were protected only within a distributor's contract demand.
 
 
 18
 Following the filing of comments by interested parties, the Commission, on July 16, 1982, affirmed and adopted the proposed order of the presiding officer. Southern Natural Gas Co., Docket No. SA80-59, Order Affirming and Adopting Proposed Order of Presiding Officer, 20 F.E.R.C. (CCH) p 61,056 (1982) ("Commission Order"). The Commission specifically affirmed the presiding officer's finding that Order No. 29 simply required a pipeline to service high priority and essential agricultural requirements up to contract limitations. It also held that changes in Southern's index of requirements did not require modification or elimination of Sec. 9.7(1). Commissioner Hughes concurred on the ground that the Commission should have granted the adjustment as provided in the earlier decision of the Director of OPPR. Two months later, the Commission denied rehearing. Southern Natural Gas Co., Docket No. SA80-59, Order Denying Rehearing, 20 F.E.R.C. (CCH) p 61,309 (1982). This timely petition for review followed.
 
 II
 
 19
 Since Atlanta's complaint before this court centers on the operation of Sec. 9.7(1), and since even respondent concedes the provision is "unusual," it is worth reviewing the reasons for its inclusion in Southern's curtailment plan. In 1973, Southern proposed a basic curtailment scheme that used as a baseline the requirements of users on the Southern system at 70? F--i.e., their overall need for fuel as opposed to that portion of their need which Southern had a contractual commitment to supply. As the mean temperature descended through levels below 70? F, adjustments were made in all allocations to assure continued satisfaction of the increased requirements of residential and small commercial customers.
 
 
 20
 This temperature sensitive adjustment, however, could lead to the inordinate expansion of some requirements at very low temperatures. Moreover, since "requirements" were computed without regard to what the retailing utilities had contracted to receive, and therefore without regard to what were their other available sources, customers had no incentive to use more expensive supplemental supplies, through such devices as peak-shaving,[5] during the winter. As the Commission explained in its Opinion No. 747, "Even a cursory review of the problem shows the need for [limitation on temperature adjustment]. The ability of the customer to avoid any peak-shaving coupled with the huge monetary advantage of using pipeline supplies would defeat Southern's ability to meet wintertime curtailment levels fairly if [a limitation] were not imposed." 54 F.P.C. at 2365.
 
 
 21
 With the need for limitation of temperature adjustment apparent, the question then became what was the appropriate limit to choose. The limit chosen by Southern, and approved by the Commission, was contract demand. The contract demand limitation restricted the total allocation to any of Southern's customers for priorities 1 through 3 to that customer's contract demand quantity. The rationale for this approach was explained by the presiding officer below:
 
 
 22
 Southern's customers had traditionally relied on their own supplemental supplies to varying degrees to satisfy increased requirements at low temperatures. For example, certain customers had contracted with Southern for an amount of natural gas sufficient to satisfy their requirements at all temperatures. Other customers, in order to maintain a high load factor, contracted for amounts of natural gas less than requirements and utilized supplemental supplies to satisfy their requirements at low temperatures. Contract demand provided a relatively accurate gauge of the ... extent to which each of Southern's customers had historically relied on Southern to satisfy these increased requirements as temperatures decreased.
 
 
 23
 Proposed Order, supra, 16 F.E.R.C. (CCH) at p. 64,162. The contract demand limitation is embodied in Sec. 9.7(1) of Southern's tariff. In a settlement approved by all parties to the present action and the Commission, see Opinion No. 5, supra, Sec. 9.7(1) was made applicable only on days when the forecast mean temperature is 48? F or lower.
 
 
 24
 Atlanta's principal argument here and before the Commission is that the passage of the NGPA since the approval of Sec. 9.7(1) requires the reexamination and rejection of that provision. Atlanta points out that under certain combinations of gas supply and temperature conditions, Sec. 9.7(1) allows deliveries of gas to low priority users while deliveries to priority 1 through 3 users are restricted. That is unquestionably true, since the whole purpose of Sec. 9.7(1) is to force the use of supplemental sources of supply by priority users. Atlanta concludes from this fact that Sec. 9.7(1) violates the NGPA provisions and the implementing Commission regulations protecting priority users and, therefore, that the Commission order approving this provision must be vacated.
 
 
 25
 This argument must be rejected. As explained earlier, the whole nature of "authorized overrun" gas--and the reason it generally comes at a cheaper price--is that it is only provided as available, after the needs of the pipeline's "contract gas" customers have been satisfied. When the latter needs consume the total pipeline supply, AO deliveries are not available and not called for. If the contract gas needs consume a large proportion of the total supply, some but not all AO deliveries will be available. In the latter situation, it is not out of accord with accepted usage to refer to the disfavored AO customers as having been "curtailed"--as the "curtailment plan" involved in the present case demonstrates. But we think the word in the operative provisions of the statute, see 15 U.S.C. Secs. 3391(a), 3392(a), bears, if it does not require, a narrower interpretation, referring to a "cutting back" from some required and contracted-for level of delivery--i.e., a failure to comply with CD volume obligations. Since the statute is "silent or ambiguous" as to which of these meanings is intended, the question before us is "whether the agency's answer is based on a permissible construction." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). We think it is.
 
 
 26
 The narrower construction is particularly reasonable in light of the absence of any indication in the legislative history of an intent to produce the massive effects which the other construction would entail. Specifically, it would convert the NGPA curtailment provisions and the implementing regulations from a means of allocating gas, in times of shortage, among those who have a contractual entitlement to it, to a means of conferring entitlements where none existed before and of invalidating innumerable private contractual arrangements. Moreover, the narrower interpretation is more compatible with the purposes of the NGPA, avoiding the consumption of scarce natural gas by users who can readily switch to another fuel, and the consequent deprivation of all energy to "captive" gas users.[6] Since, by and large if not uniformly, AO customers are precisely those who have alternate sources (such as propane gas used in "peak-shaving") and CD customers are precisely those who have nowhere else to turn, it makes eminent sense to assure that the entitlements of contract customers are satisfied before any overrun customers are served. Interpreting the word "curtailment" in the Act as applicable only to cut-backs in CD service achieves this intelligent and hence presumably intended result. This is not to say that the Commission cannot, pursuant to "its broad authority to regulate the interstate transportation of natural gas," Process Gas Consumers Group v. Dep't of Agriculture, 694 F.2d 778, 784 (D.C.Cir.1982) (en banc) (footnote omitted), require the statutory curtailment priorities to be applied, at least in specified cases or circumstances, to AO gas as well. But the statute itself is reasonably interpreted not to compel that consequence across the board.
 
 
 27
 Earlier opinions of this court support the Commission's interpretation. In Process Gas Consumers Group v. Dep't of Agriculture, 694 F.2d 728, 750 (D.C.Cir.1981) we said:
 
 
 28
 Thus, although Congress was clearly concerned in regards to agricultural users that shortages of natural gas would have a devastating effect on the cost and availability of food and fiber, there is nothing in either the NGPA or its legislative history to suggest that where the agricultural user is subject to a ceiling on demand during periods of normal operation, the supply restriction should become inoperative by the existence of a supply curtailment.
 
 
 29
 Accordingly, we affirm the use of a certificate or contract provision as a ceiling on the demand for agricultural users.
 
 
 30
 Our en banc decision in Process Gas Consumers Group v. Dep't of Agriculture, 694 F.2d at 787 n. 31, reaffirmed this holding: "The only limitation on serving new agricultural demand is that the demand fall within contract and certification amounts.... This limitation was upheld by the panel opinion in this case and was not vacated as part of this en banc proceeding. See Process Gas II, 694 F.2d at 749-51."
 
 
 31
 Atlanta makes two further arguments, more narrowly confined to the facts of this case. The Commission's regulations adopted in Order No. 29, applying the foregoing principle that the curtailment limitations govern only contract gas deliveries, provide that "[n]otwithstanding any other provisions of this subpart, an interstate pipeline ... shall not be required to deliver to any customer volumes of natural gas ... which exceed the volumes of natural gas that the interstate pipeline may deliver to such customer without causing the interstate pipeline to violate any ... volumetric limitations established in the contract between the interstate pipeline and such customer." 18 C.F.R. Sec. 281.204(c)(2) (1984) (emphasis added). Atlanta argued before the Commission that since the only formal contract it has with Southern is the standard service agreement for the purchase and sale of CD gas, the Sec. 9.7(1) limitation here (referred to only in the AO rate schedule) is not " 'established in [a] contract' " with it and is therefore unenforceable. The Commission responded that the CD service agreement incorporated by reference the AO rate schedule, which was part of the attached Exhibit A. Commission Order, 20 F.E.R.C. (CCH) at p. 61,121. Atlanta has replied on this appeal that the agreement by its terms provides only that "[g]as shall be purchased and sold hereunder [i.e., under the CD purchase agreement] ... under the provisions of the Company's rate schedule designated in Exhibit A hereto" (emphasis added). Brief for Petitioner at 42. Since, Atlanta argues, only CD gas is at issue, only the CD rate schedule and not the AO rate schedule could be referred to.
 
 
 32
 We would in any event be disposed, on a matter of contract interpretation, "to accord great weight to the judgment of the expert agency that deals with agreements of this sort on a daily basis." Kansas Cities v. FERC, 723 F.2d 82, 87 (D.C.Cir.1983). But in fact we find it difficult to understand both Atlanta's argument and the Commission's response. There is no reason why, as Atlanta's argument assumes, the provisions of Sec. 9.7(1) can only be imposable upon Atlanta through the Commission's curtailment regulation, and as mandated by that regulation. It suffices if Sec. 9.7(1) is a valid tariff provision not in violation of any of the Commission's regulations. The Commission's response to this argument is also incomprehensible, since it seems to concede (as Atlanta assumes) that the "volumetric limitations" referred to in the regulation, and hence also presumably the "delivery requirements" in the regulation limited by the "volumetric limitations," refer to AO as opposed to exclusively CD gas. That position is thoroughly consistent with Atlanta's argument, but is quite at odds with the Commission's view of the meaning of both the statute and the implementing regulations. But while we do not consider the Commission's response a comprehensible one, since Atlanta's objection in any event presented a non-problem, we find this exchange of irrelevancies no basis for overturning the Commission's decision.
 
 
 33
 Atlanta also notes one peculiar effect of the Commission's order here. A portion of the requirements in Southern's new priority 2.1 were included, before the adoption of the NGPA, in priorities 4 through 9. When Southern upgraded these requirements to conform with the NGPA classification scheme, they became subject to the operation of the Sec. 9.7(1) limitation as the lower classifications did not --thus causing, insofar as AO distribution was concerned, "the protection of those requirements against curtailment [to be] decreased, exactly opposite to the intended effect of the NGPA." Brief for Petitioner at 24. The perverse effect is unquestionable. Because of the peculiar nature of the settlement agreed upon for allocation of AO gas in the Southern system--explicitly designed to prevent inordinate expansion of the demands of priority 1 through 3 users--the effect of elevating certain uses to those priorities was, insofar as AO supply is concerned, to deprive them of gas rather than entitle them to it. We are not concerned that this constitutes in and of itself a violation of the NGPA, since the Act's curtailment requirements, as we have seen, do not strictly apply to AO gas. But the Commission cannot have it both ways: It cannot assert that the curtailment priorities do not apply to AO supply, yet simultaneously approve what is in effect a revision of the Southern AO settlement achieved by blindly redefining the priorities of that settlement to conform with those of the NGPA. If the NGPA only affected priorities within the CD supply, which supply as a whole is entirely protected when the Sec. 9.7(1) restrictions are triggered, there is no apparent reason why the new NGPA priorities should be given any effect upon the carefully calculated and agreed-upon distribution scheme for AO gas when temperatures fall below 48 degrees--a scheme concededly designed not to protect priority users, but to calibrate pressure upon distribution companies to bring on line their supplemental supplies. Indeed, to permit the NGPA priorities automatically to affect this scheme appears to violate the Commission's policy set forth in Order No. 29:
 
 
 34
 In all other respects, it is the Commission's intention to preserve the existing base period data and method of implementation of existing interstate pipeline curtailment plans. We are particularly mindful of the Statement of Managers [of the bill that became the NGPA] which expresses a clear desire to avoid disruption of existing curtailment plans upon implementation of Section 401.
 
 
 35
 Order No. 29, FERC Statutes and Regulations (CCH) at p. 30,362. We find unpersuasive the Commission's ipse dixit that "[t]he role assigned to distribution company supplemental supplies by Section 9.7(1) is not static," and "changes in response to changes in the index of requirements." Commission Order, 20 F.E.R.C. (CCH) at p. 61,119. It may indeed, if the parties agree to or the Commission approves a revision of priorities for Sec. 9.7(1) purposes based upon the rationale of Sec. 9.7(1)--which is not (and is indeed quite the opposite of) the NGPA rationale of favoring those users defined as priority users in the statute. It is noteworthy that the Commission staff agreed with Atlanta on this point. We are inclined to as well, but find that we need not reach the issue.
 
 
 36
 Neither before the Commission nor on this appeal did Atlanta raise this apparently improper use of NGPA priorities as the basis for a claim that the Southern tariff's old definition of priorities should have been left in effect. To the contrary, it sought to convert this into merely one piece of evidence demonstrating the truth of a quite different point--that Sec. 9.7(1) was in its totality invalidated by the NGPA, which requires the application of NGPA priority service requirements across the board, to CD and AO gas alike. Thus, in Atlanta's brief on appeal the "perverse effect" point is merely a subhead of an argument entitled "The Commission majority imposes service obligations on the local distribution companies that the NGPA has assigned to the interstate pipelines." Brief for Petitioner at 22; see id. at 24. Whatever may be the propriety of what the Commission did in this regard, we will not reverse its action on this appeal, either because Atlanta cannot fairly be regarded as having raised the point, see Atlantic Richfield Co. v. FPC, 585 F.2d 943, 946 (9th Cir.1978), or because we have no reason to believe that the unrequested remedy which the point would justify (remand to consider reversion to former tariff priorities while leaving Sec. 9.7(1) otherwise in effect) would provide relief significantly helpful to Atlanta, cf. North Carolina v. FERC, 730 F.2d 790, 798-99 (D.C.Cir.1984).
 
 
 37
 Atlanta's other objections are even less substantial and warrant no separate discussion. For the reasons stated, the Commission order approving Southern's filing must be upheld and the petition for review is
 
 
 38
 Denied.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 Until 1977, the Federal Power Commission was the federal agency in charge of regulation of natural gas. Its functions in that regard were transferred to the Federal Energy Regulatory Commission on August 4, 1977. Department of Energy Organization Act, Pub.L. No. 95-91, Sec. 301(b), 91 Stat. 565, 578 (1977) (codified at 42 U.S.C. Sec. 7151(b) (1982)). This opinion refers to both agencies as "the Commission."
 
 
 [2]
 Section 9.7(1), which embodies the limitation agreed to by the parties, provides in pertinent part:
 (1) COMPANY shall maintain an Index of Requirements which shall specify for each PURCHASER at each delivery point the requirements referred to in Section 9.2. Absent a finding by the Commission of extraordinary circumstances, the requirements reflected in such Index for priority-of-service categories (1) through (3) as set out in Section 9.2 shall never exceed a PURCHASER's applicable CONTRACT DEMAND or MAXIMUM DELIVERY OBLIGATION on any day when the forecast mean temperature at Birmingham, Alabama is 48 degrees Fahrenheit or lower.
 
 
 [3]
 Section 401(a), 15 U.S.C. Sec. 3391(a), provides in relevant part:
 [T]he Secretary of Energy shall prescribe and make effective a rule ... which provides that notwithstanding any other provision of law (other than subsection (b) of this section) and to the maximum extent practicable, no curtailment plan of an interstate pipeline may provide for curtailment of deliveries of natural gas for any essential agricultural use, unless such curtailment--
 (1) does not reduce the quantity of natural gas delivered for such use below the use requirement specified in subsection (c) of this section; or
 (2) is necessary in order to meet the requirements of high-priority users.
 Section 401(f)(2), 15 U.S.C. Sec. 3391(f)(2), defines "high-priority user" as:
 any person who--
 (A) uses natural gas in a residence;
 (B) uses natural gas in a commercial establishment in amounts of less than 50 Mcf on a peak day;
 (C) uses natural gas in any school, hospital, or similar institution; or
 (D) uses natural gas in any other use the curtailment of which the Secretary of Energy determines would endanger life, health, or maintenance of physical property.
 Section 402(a), 15 U.S.C. Sec. 3392(a), provides similar protection for "deliveries of natural gas for any essential industrial process or feedstock use...."
 
 
 [4]
 The numbers used to designate priorities are somewhat confusing. The NGPA, while giving priority to certain types of gas, does not itself create any numbering scheme. The Commission's regulations, however, set up two numbered priorities: priority 1 for "high-priority entitlements" and priority 2 for "essential agricultural use requirements." See 18 C.F.R. Sec. 281.205(a) and definitions contained in 18 C.F.R. Sec. 281.203(a)(2), (4) & (5). Southern's tariff at issue here sets up several numbered priorities including: priority 1, essentially paralleling the Commission's priority 1; priority 2.1, essentially paralleling the Commission's priority 2; priority 2.2 for gas used for "[l]arge commercial requirement[s] of 50 Mcf or more on a peak day not specified in (1) and (2.1), industrial requirements for plant protection, feedstock and process needs, and pipeline customer storage injection requirements"; and priority 3 for gas used for "[a]ll other industrial requirements below 300 Mcf per day." See General Terms and Conditions, Secs. 9.2, 9.8, reprinted in R. at 861, 863. To avoid confusion, all priority numbers referred to in the balance of this opinion come from Southern's numbering scheme
 
 
 [5]
 "Peak-shaving" refers to the practice of adding propane air mixtures to augment supplies of natural gas during periods of peak demand. See Laclede Gas Co. v. Amoco Oil Co., 522 F.2d 33, 40 n. 4 (8th Cir.1975)
 
 
 [6]
 See 15 U.S.C. Secs. 3391(b), 3392(b), which entirely exclude from the priority categories of "essential agricultural use" and "essential industrial process and feedstock uses," respectively, a use for which a fuel other than natural gas is "reasonably available" and "economically practicable." It is possible to argue, of course, that this explicit statutory provision implies that the availability of alternate fuel is not relevant for any other purposes. It seems to us more plausible however, that a factor important enough to disqualify some otherwise preferred uses from priority status would also be considered in determining the nature of the supplies (all supplies or only contracted-for requirements) to which the priority status applies