The PROCESS GAS CONSUMERS
GROUP, et al., Petitioners,

v.

U.S. DEPARTMENT OF AGRICUL-
TURE, Bob Bergland, Secretary
of Agriculture, Respondents,

United Gas Pipe Line Company, et
al., Intervenors.

UNITED GAS PIPE LINE COMPANY,
Petitioner,

v.

U.S. DEPARTMENT OF AGRICUL-
TURE, Bob Bergland, Secretary
of Agriculture, Respondents,

Transcontinental Gas Pipe Line
Corporation, et al., Intervenors.

The PROCESS GAS CONSUMERS
GROUP, et al., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

American Bakers Association,
et al., Intervenors.

COLUMBIA GAS TRANSMISSION
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

United Distribution Companies, the United States Brewers Association, Inc., Public Service Commission of New York, Consolidated Gas Supply Corporation, Great Western Sugar Company, Tennessee Gas Pipeline Co., Intervenors.

UNITED DISTRIBUTION COMPANIES,
Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,

Consolidated Gas Supply Corporation,
Intervenor.

UNITED DISTRIBUTION COMPANIES,
Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

The BROOKLYN UNION GAS
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,
Public Service Commission of
New York, Intervenor.

STATE OF LOUISIANA, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

COLUMBIA NITROGEN CORPORA-
TION and Nipro, Inc., Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

FIRST MISSISSIPPI CORPORATION,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

ATLANTA GAS LIGHT COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

FIRST MISSISSIPPI CORPORATION,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

UNITED GAS PIPE LINE COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

The PROCESS GAS CONSUMERS
GROUP, American Industrial Clay Com-
pany of Sandersville and Georgia Kaolin
Company, Petitioners,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

ALLIED CHEMICAL CORPORATION,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

STATE OF LOUISIANA, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

CONSOLIDATED EDISON COMPANY
OF NEW YORK, INC., Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

The FERTILIZER INSTITUTE,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

COLUMBIA GAS TRANSMISSION
CORPORATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

The BROOKLYN UNION GAS
COMPANY, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

**780**

UNITED DISTRIBUTION COMPANIES,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

NATIONAL FOOD PROCESSORS
ASSOCIATION, Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

ATLANTA GAS LIGHT COMPANY,
Petitioner,

v.

FEDERAL ENERGY REGULATORY
COMMISSION, Respondent.

No. 79–1336.*

United States Court of Appeals,
District of Columbia Circuit.

Argued En Banc April 13, 1982.

Decided Oct. 1, 1982.

---

* Also Nos. 79–1713, 79–1449, 79–1511, 79–1534, 79–1557, 79–1568, 79–1569, 79–1585, 79–1610, 79–1617, 79–1655, 79–1765, 79–1813, 79–2259, 79–2273, 79–2297, 79–2314, 79–2323, 79–2352, 79–2361, 79–2368, 79–2369 and 79–2435.

Jerome M. Feit, Sol., F.E.R.C., Washington, D.C., with whom George H. Williams, Jr., Atty., F.E.R.C., Washington, D.C., was on the rehearing brief on Section II.A for respondents.

Edward J. Grenier, Jr., Richard P. Nolan, Robert W. Clark, III, and William H. Penniman, Washington, D.C., for the Process Gas Consumers Group, C. William Cooper, Falmouth, Mass., Richard M. Merriman, and John R. Schaefgen, Jr., Washington, D.C., for United Distribution Companies, Lewis Carroll, Birmingham, Ala., and Gordon Grant, Washington, D.C., for Washington Gas Light Co., Joseph P. Stevens and Alvin Adelman, Brooklyn, N.Y., for the Brooklyn Union Gas Co. and Richard A. Solomon, Washington, D.C., for The Public Service Commission of the State of N.Y. were on the rehearing brief on Section II.A for petitioners.

Steven A. Herman, Washington, D.C., for American Bakers Ass'n and The Fertilizer Institute with whom William A. Mogel, Washington, D.C., for American Meat Institute, et al., Joseph M. Creed, Washington, D.C., for Biscuit & Cracker Mfrs' Ass'n, Joseph S. Fontana, Washington, D.C., for Corn Refiners Ass'n, Albert J. Feigen, Washington, D.C., for American Sugar Cane League of the U.S.A., Inc., Richard S. Harrell, Washington, D.C., for Distilled Spirits Council of the U.S., Inc., Margaret M. Huff and Michael J. Huston, Indianapolis, Ind., for Eli Lilly Co., Gerard Paul Panaro, Washington, D.C., for Retail Bakers of

America, James W. Riddell, Washington, D.C., for U.S. Brewers Ass'n, Inc., Keith R. McCrea, Washington, D.C., for Glass Packaging Institute, Donald A. Frederick, Washington, D.C., for National Council of Farmers Co-op., Edwin H. Pewett and Michael J. Ruane, Washington, D.C., for National Meat Ass'n, and Frederic G. Berner, Jr., Washington, D.C., for National Soybean Processors Ass'n were on the joint rehearing brief on Section II.A for Agriculture intervenors.

Anthony J. Steinmeyer and Bruce G. Forrest, Attys., Dept. of Justice and Terrence G. Jackson, Atty., Dept. of Agriculture, Washington, D.C., were on the rehearing brief on Section II.A for respondent, U.S. Dept. of Agriculture.

Gregory Grady, Washington, D.C., with whom Michael J. McDonald, Nicholas W. Fels, K. Gregory Tucker, Washington, D.C., Thomas E. Midyett, Knoxville, Tenn., A.S. Lacy and Roy R. Robertson, Jr., Birmingham, Ala., were on the joint rehearing brief on Section II.A for petitioners, Midwestern Gas Transmission Co., et al.

John R. Holtzinger, Jr., Paul H. Keck, John T. Stough, Jr., and Brian R. Gish, Washington, D.C., for Atlanta Gas Light Co. and William I. Harkaway and G. Douglas Essy, Chicago, Ill., for Consol. Edison Co. of New York, Inc. were on the joint rehearing brief on Section II.A for respondents.

David B. Robinson and James R. Patton, Jr., Washington, D.C., for the State of La., Nicholas W. Fels, Washington, D.C., for Air Products and Chemicals, Inc., et al., and Michael J. Manning, Washington, D.C., for Entex were on the joint rehearing brief on Section I.C for petitioners.

D. Knox Bemis, Washington, D.C., with whom W. DeVier Pierson, Richard A. Yarmey, Washington, D.C., and Sheila Jackson Lee, Houston, Tex., were on the rehearing brief on Section I.C for petitioners, United Gas Pipe Line Co.

Joel M. Cockrell, Atty., F.E.R.C., Washington, D.C., with whom Jerome M. Feit, Sol., and George H. Williams, Jr., Atty., F.E.R.C., Washington, D.C., were on the rehearing brief on Section I.C for respondent.

Joseph P. Stevens and Alvin Adelman, Brooklyn, N.Y., for The Brooklyn Union Gas Co., Richard A. Solomon, Washington, D.C., and David D'Alessandro for the Public Service Com'n of the State of N.Y., Inc. and Lewis Carroll, Birmingham, Ala., and Gordon M. Grant, Washington, D.C., for Washington Gas Light Co. were on the joint rehearing brief on Section I.C for respondents.

Before ROBINSON, Chief Judge, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges, and ROBB,[**] Senior Circuit Judge.

## PER CURIAM:

The court's opinion in this case consists of the panel opinion of July 29, 1981, except for Parts II.A.2 and II.A.3, together with the *en banc* opinion of October 1, 1982. The court's order of November 13, 1981 granting rehearing *en banc* vacated Parts I.C and II.A of the panel opinion; the *en banc* opinion, however, reinstates Part II.A.1 of the panel opinion and adopts Part I.C of the panel opinion as the opinion of the *en banc* court.

Opinion for the Court filed by Circuit Judge WALD.

WALD, Circuit Judge:

We granted rehearing *en banc* [***] in this case to determine whether the Federal En-

---

[**] Sitting by designation and assignment pursuant to 28 U.S.C. § 294(c) and the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, § 205, 96 Stat. 25, 53.

[***] This court's order of November 13, 1981 granting rehearing *en banc* is reprinted as an Appendix to this opinion. The panel opinion is reprinted immediately preceding this opinion. 694 F.2d 728 (D.C.Cir.1981).

ergy Regulatory Commission ("FERC" or "Commission")[1] improperly construed its authority under sections 401 and 403 of the Natural Gas Policy Act of 1978 ("NGPA")[2] with respect to integrating priority treatment for essential agricultural uses into ongoing curtailment plans.[3] Under the NGPA, the Secretary of Agriculture ("Secretary") is instructed to certify amounts of natural gas required to supply "essential agricultural uses"[4] so as to meet "full food and fiber production."[5] The Commission is then instructed to implement the Secretary's certification by assuring that "to the maximum extent practicable" essential agricultural use requirements will not be curtailed unless doing so is necessary to meet the needs of the highest priority users: resi-

dential customers, small commercial establishments, schools, hospitals and other users for whom curtailment might be life threatening or might endanger physical property.[6] In this case, the Commission ruled that its implementation authority under the NGPA is not sufficiently broad to allow it to limit implementation of certified essential agricultural requirements to those requirements reflected in "base-year" curtailment plans.[7] Because we conclude that the Commission failed to exercise its authority to determine whether any modification to full implementation is appropriate to protect the interests of high priority users, and has therefore allowed an apparent reversal of statutory priorities to be carried out by *default* rather than by any considered analysis of curtail-

1. Pursuant to the Department of Energy Organization Act, Pub.L. No. 95–91, 91 Stat. 565 (1977) (codified at 42 U.S.C. § 7101 *et seq.*), FERC took over the Federal Power Commission's ("FPC") authority to supervise curtailment plans. This opinion refers to both the FPC and FERC as "the Commission."

2. Pub.L. No. 95–621, 92 Stat. 3350, §§ 401, 403 (1978) (codified at 15 U.S.C. §§ 3391, 3393).

3. In granting rehearing *en banc,* this court vacated Parts I.C and II.A of the panel opinion. Because the petitions for rehearing did not challenge Part II.A.1 of the panel opinion, we issued an order on January 22, 1982 instructing the parties not to brief that issue and we hereby reinstate Part II.A.1 of the panel opinion. Following briefing and oral argument on the remaining issues, the court has decided to adopt Part I.C of the panel opinion as the opinion of the en banc court. Thus, we adopt the panel's view that the Commission's specific grants of authority under sections 401, 402, 501 and 502 of the NGPA control over the general requirements of sections 4 and 5 of the Natural Gas Act, 15 U.S.C. §§ 717c, 717d. In doing so, we accept the Commission's position that section 502(c) of the NGPA, 15 U.S.C. § 3412(c), is an appropriate mechanism for correcting any inequities in specific plans that follow from application of its generic rule. By its terms, section 502(c) allows for adjustments "as may be necessary to prevent special hardship, *inequity, or an unfair distribution of burdens,*" 15 U.S.C. § 3412(c) (emphasis added), and the Commission assures us that such adjustments have been granted promptly. *See* Brief for FERC on Petitions for Rehearing En Banc of Section "I–C" of the Court's July 29, 1981 Opinion at 25 n. 16. Absent a ripe case or controversy regarding the application of section 502(c), however, we refrain from expressing an opinion as to

whether our decision in *North Carolina v. FERC,* 584 F.2d 1003, 1012–15 (D.C.Cir.1978) delineates the scope of the Commission's authority in a section 502(c) proceeding.

4. Essential agricultural use is defined as any use of natural gas:

(A) for agricultural production, natural fiber production, natural fiber processing, food processing, food quality maintenance, irrigation pumping, crop drying, or

(B) as a process fuel or feedstock in the production of fertilizer, agricultural chemicals, animal feed, or food, which the Secretary of Agriculture determines is necessary for full food and fiber production. NGPA § 401(f),

15 U.S.C. § 3391(f).

5. *Id.* § 401(c), 15 U.S.C. § 3391(c).

6. This responsibility derives from section 401(a) of the NGPA, 15 U.S.C. § 3391(a). Under 401(a), the Secretary of Energy is instructed, under a 120 day deadline, to fashion a rule providing that "to the maximum extent practicable" essential agricultural users will not be curtailed unless doing so is necessary to protect high priority users. The Secretary's rule, which adopts the language of 401(a) almost verbatim, *see* note 35 *infra,* is then to be implemented by the Commission under section 403 of the NGPA, 15 U.S.C. § 3393. The question before us is whether the Commission read its rulemaking powers under section 403, and consequently the substantive standards of section 401, too narrowly.

7. A "base-year" curtailment plan allocates natural gas according to amounts consumed during a particular historical period. *See* notes 16–20 and accompanying text *infra.*

ment policy, we reverse and remand this aspect of the Commission's decision.

## I. BACKGROUND

Prior to passage of the NGPA, the Commission reviewed natural gas curtailment plans pursuant to its broad authority to regulate the interstate transportation of natural gas.[8] Early on in the development of such plans, the Commission expressed a preference for "end-use" plans—that is, plans that would distribute natural gas according to the needs of the ultimate consumer.[9] Residential consumers, for whom temporary curtailments could be life threatening, were given highest priority. Those for whom curtailment was considered to pose the least hardship—customers with "interruptible" contracts and those who used natural gas as a boiler fuel—were given lowest priority. Since curtailment plans only covered direct customers of interstate pipelines, there was no assurance that natural gas allotted to a distributor based on the high priority status of his customers would actually reach the preferred end-users.[10] Nonetheless, the Commission stood by its position that end use plans would most equitably distribute natural gas. By the time the NGPA was enacted, the Commission's end use methodology was firmly established.[11]

■ Section 401 of the NGPA was designed to remedy a gap in the standard end use scheme. As numerous legislators explained, standard end use plans did not provide any special protection for agricultural users of natural gas.[12] Consequently, when natural gas supplies were short, agricultural users had to compete with large numbers of industrial users for the natural gas that remained following disbursal to preferred users. The ramifications of this priority schedule were far-reaching. In some cases, temporary shortages of natural gas were responsible for causing the complete destruction of agricultural products.[13]

The remedy set forth by the NGPA was to give agricultural users a high priority, second only to the highest priority of resi-

---

**8.** See FPC v. Louisiana Power & Light Co., 406 U.S. 621, 640–41, 92 S.Ct. 1827, 1838–39, 32 L.Ed.2d 369 (1972).

**9.** The Commission explained this system of preferences in a pair of policy statements. See Order No. 467, 49 F.P.C. 85, 87–88 (1973); Order No. 467–B, 49 F.P.C. 583, 587–88 (1973).

**10.** In general, local distribution of natural gas is controlled by state utility commissions that may have their own rules for intrastate distribution. The Commission has not asserted authority over these local distributors, nor has Congress required it to assert such authority. See Elizabethtown Gas Co. v. FERC, 636 F.2d 1328, 1332 (D.C.Cir.1980). Cf. Process Gas Consumers Group v. United States Dep't of Agriculture, 694 F.2d 728, 742 (D.C.Cir.1981) ("Process Gas II") (section 401(a) not intended to "reach the activities of local distributors").

**11.** Prior to the NGPA's enactment, there was no specific statutory authority for end use plans. Such plans were therefore challenged as illegally reallocating natural gas among pipeline customers and as illegally discriminating among customers. We rejected both grounds for concluding that end use plans are illegal per se. See American Smelting & Refining Co. v. FPC, 494 F.2d 925, 936 (D.C.Cir.), cert. denied, 419 U.S. 882, 95 S.Ct. 148, 42 L.Ed.2d 122 (1974) (end use plans do not reallocate natural gas within the meaning of 15 U.S.C. § 717f(a)); North Carolina v. FERC, 584 F.2d 1003, 1007 (D.C.Cir.1978) (end use plans are not per se discriminatory). With the enactment of the NGPA and its scheme of end use priorities, the legality of end use plans is now beyond question.

**12.** The omission of a priority category for agricultural users was not simply a matter of oversight. On the contrary, agricultural users had sought special treatment before the Commission in several proceedings. See, e.g., Southern Natural Gas Co., 54 F.P.C. 2298, 2306, amended on other grounds, 54 F.P.C. 2647 (1975); Texas Eastern Transmission Corp. (Carnegie Natural Gas Co.), 52 F.P.C. 1814, 1819 (1974), amended on other grounds, 53 F.P.C. 220, 53 F.P.C. 407 (1975). The Commission had rejected pleas for special treatment on the ground that curtailment should be based on types of gas burning equipment rather than on the end-product for which natural gas was being burned.

**13.** See, e.g., 124 Cong.Rec. 28,874 (1978) (remarks of Sen. Talmadge) (curtailments required dumping of milk); 123 Cong.Rec. 31,240 (1977) (remarks of Sen. Bumpers) (4.7 million chickens died in Arkansas in February 1977 due to curtailments).

dential users, small commercial establishments, hospitals, schools and other uses for which curtailments could be life threatening or dangerous to property. The statute provides a two step procedure for implementing this new priority system. First, the Secretary of Agriculture is instructed to certify, in volumetric or percentage terms, the natural gas requirements of agricultural users needed to meet full food and fiber production.[14] Once these amounts have been certified, the Commission is instructed to reopen curtailment plans to provide, "to the maximum extent practicable," that essential agricultural users will only be curtailed when necessary to meet the requirements of the highest priority grouping.[15]

In this case, a series of shifting positions by the Secretary and the Commission has resulted in a curtailment scheme in which some agricultural users are given preference over some users in the highest priority. In his initial notice of proposed rulemaking issued on November 20, 1978,[16] the Secretary of Agriculture took the position that the Commission's traditional base year methodology[17] would be inadequate to estimate the needs of agriculture. Under a base year methodology, a curtailment plan allocates natural gas to distributors according to an end use profile of their customers during a particular historical period.[18] Thus, a distributor's allotment during curtailment does not include any provision for customers added on following the base year.[19] Even when the new customers qualify for the highest priority classification, the fact that they were not serviced during the base year precludes priority treatment. Because of "the vagaries of weather whereby energy demands unpredictably vary from season to season and year to year," the Secretary proposed to replace the "impractical" historical base period concept with a certification of "100 percent of current requirements."[20]

In its proposed rule issued two months after the Secretary's proposed rule, the Commission stood by its base period approach. The Commission explained that its "proposed rule is limited to the basis upon which the interstate pipeline now curtails."[21] In the Commission's view, this approach would minimize disruption to existing curtailment plans, in accordance with the directions of the NGPA Conference Report, which stated that:

> For purposes of implementing this section, the Commission is instructed to reopen curtailment plans that are already

---

**14.** NGPA § 401(c), 15 U.S.C. § 3391(c).

**15.** *Id.* §§ 401(c), 403, 15 U.S.C. §§ 3391(a), 3393. *See* note 6 *supra.*

**16.** *See Notice of Proposed Rulemaking, Essential Agricultural Uses of Natural Gas* (Nov. 20, 1978), J.A. 77; 43 Fed.Reg. 54,938 (Nov. 24, 1978).

**17.** As the Commission notes in its brief, not all curtailment plans rigidly follow the traditional base period methodology. *See* Brief for FERC on Rehearing En Banc of Section "2–A" of the Court's July 29, 1981 Opinion, Appendix B. Some plans, for example, employ a fixed base period for large customers, with an exemption for smaller users. *See* Joint Reply Brief on Rehearing En Banc of The Process Gas Consumers Group, *et al.* at 6 (discussing the curtailment plan for the Panhandle Eastern Pipe Line Co.). The Commission's general opinion, however, is that opening up curtailment plans to load growth would "unsettle most existing curtailment plans." *See* Brief for FERC on

Rehearing En Banc of Section "2–A" of the Court's July 29, 1981 Opinion at 23.

**18.** *See generally North Carolina v. FERC,* 584 F.2d 1003, 1012–13 (D.C.Cir.1978).

**19.** Similarly, a base period methodology does not account for customers who leave the distributor's system, or for reductions in the amount of natural gas demanded by those customers. Indeed, section 605 of the Public Utility Regulatory Policies Act of 1978, Pub.L. No. 95–617, 92 Stat. 3117 (1978) (codified at 15 U.S.C. § 717x), specifically provides that allotments of natural gas during curtailment should not be reduced as a result of conservation measures.

**20.** *Notice of Proposed Rulemaking, Essential Agricultural Uses of Natural Gas* (Nov. 20, 1978), J.A. 89–90; 43 Fed.Reg. 54,938, 54,950 (Nov. 24, 1978).

**21.** *Notice of Proposed Rulemaking,* FERC Docket No. RM79–15 (Jan. 12, 1979), J.A. 265.

in effect under the Natural Gas Act only to the extent necessary to adjust those plans to bring them into conformity with the new curtailment priority schedule. The conferees were concerned that these changes not burden the Commission with lengthy proceedings which might throw existing curtailment plans into disarray. Therefore, the conference agreement includes the term "to the maximum extent practicable" to assure that the Commission has the necessary flexibility in implementing any changes. For example, the conferees do not intend the reopening of curtailment plans for this limited purpose to result in adoption of a new base year for curtailment purposes.[22]

The Secretary of Agriculture's interim final rule, issued on February 8, 1979, cut back on the broad sweep of his proposed rule. Instead of certifying one hundred percent of current requirements for all agricultural users, the Secretary proposed a dual approach applying current requirements for small scale uses and a base year methodology for other essential agricultural uses.[23] On March 6, 1979, the Commission accepted the Secretary's certification on an interim basis although it continued to state that the amount of permissible load growth was a "vital issue" deserving further comment.[24] Following further consideration of its authority to limit agricultural load growth, the Commission reached the conclusion that it was without authority to cut back on the agricultural uses certified by the Secretary.[25] The Commission explained that:

> In the past, the Commission's policy has not favored load growth, *i.e.,* increasing new customers or base period entitlements. However, the Commission's reading of the NGPA and the many comments and legal analysis provided it in the extensive record in this proceeding leads it to the conclusion that some agricultural load growth was intended by Congress.... Thus, to the extent that load growth is required by USDA rule and the agricultural users [sic] (or its local distributor) has the requisite contractual authority, it is the Commission's view that Congress intended that agricultural load growth be permitted.[26]

Thus, when the Secretary subsequently returned to his initial proposal of certifying one hundred percent of current requirements for *all* essential agricultural uses,[27] the Commission incorporated this certification on a permanent basis.[28]

■ On petitions for review, a panel of this court agreed with the Commission that it was required to open curtailment plans not only to reorder priorities, but also to add demand representing agricultural load growth into the priority category for essential agricultural use.[29] The panel recognized, however, that adding agricultural load growth, while continuing to exclude high priority load growth, would result in a seeming reversal of statutory priorities. This reversal of priorities may be illustrated

**22.** *Id.,* J.A. 272. *See also Notice of Proposed Rulemaking,* FERC Docket No. RM79–13 (Jan. 10, 1979), J.A. 184–85 (quoting H.R.Rep. No. 1752, 95th Cong., 2d Sess. 113 (1978)).

**23.** *Interim Final Rule, Essential Agricultural Use of Natural Gas,* J.A. 104 (Feb. 8, 1979); 44 Fed.Reg. 11,518, 11,523 (Mar. 1, 1979).

**24.** *Interim Curtailment Rule,* FERC Docket No. RM79–13 (Mar. 6, 1979), J.A. 212.

**25.** *Order No. 29, Final Rule,* FERC Docket No. RM79–15 (May 2, 1979), J.A. 315.

**26.** *Id.,* J.A. 315–16.

**27.** *Essential Agricultural Uses and Requirements—Natural Gas Policy Act, Final Rule* (May 10, 1979), J.A. 162; 44 Fed.Reg. 28,782, 28,784 (May 17, 1979).

**28.** *Order No. 29–A, Final Rule,* FERC Docket No. RM79–15 (June 15, 1979), J.A. 375. *See also Order No. 29–C, Order Amending Regulation, Granting in Part and Denying in Part Petitions for Rehearing and Motions for Clarification, Denying Motion for Oral Argument, and Denying Motions to Waive Regulations and Accept Late Filed Petitions,* FERC Docket No. RM79–15 (Oct. 22, 1979), J.A. 405 (adherence to base periods would not fulfill the Commission's "duty to implement the certification of 100 percent of current requirements").

**29.** *See Process Gas II,* 694 F.2d at 753.

by a simple example.[30] Under the traditional, "base period," approach to curtailment, a distributor who provides 100,000 units of gas to residential customers today, but only provided 50,000 units in the relevant base period, will receive natural gas during curtailment based on only 50,000 units of use. The remaining 50,000 units of demand will stand outside the ambit of the curtailment plan, and will only be served if natural gas supplies exceed the total demand accounted for by the plan. As implemented by FERC the Secretary's definition of essential agricultural use upsets this standard plan by computing agricultural entitlements based on current demand. Thus, 100,000 units of agricultural demand will be accounted for in the plan *even if* there was only 50,000 units of demand in the base period.[31] As this example readily shows, agricultural demand created between the base period and the date of curtailment receives preferential treatment with respect to analogous demand in the highest priority. Put more graphically the distributor who serves a family or hospital that installed a gas furnace following the base period is required to wait in line behind one who supplies natural gas to a newly built beer factory. The panel concluded that this reversal of statutory priorities places the priority schedule on its head, and remanded the Commission's rule with instructions to "draft a rule that does not in practice reverse the statutory scheme of section 401." [32] The panel dissent, while agreeing that the Commission's rule should be remanded because it reverses the statutory scheme of priorities, argued that Title IV of the NGPA did not mandate a policy of agricultural load growth. The dissent concluded that the Commission should be allowed to "utilize its much needed 'expertise' to resolve this complex curtailment problem." [33] We granted rehearing *en banc* on November 13, 1981. In this opinion we conclude that the Commission has authority to review the "practicability" of incorporating load growth for agricultural users into existing curtailment plans insofar as it has consequences for the Commission's curtailment policies regarding high priority users. Because the Commission erroneously considered itself bound to incorporate such load growth regardless of the consequences for natural gas markets or high priority users currently placed outside the ambit of curtailment plans, we remand for further consideration.

## II. THE SCOPE OF THE COMMISSION'S AUTHORITY

As counsel for the Commission stated at oral argument, there is an inherent tension between section 401's delegation of certification responsibility to the Secretary and the statute's caveat that the certification need only be incorporated to "the maximum extent practicable." The Commission's opinion, however, does not seek to resolve this tension. Rather than giving content to the practicability language of section 401, the Commission concluded that it was simply bound by law to fashion a rule that would fully accommodate the Secretary's certification.[34] In doing so, the Commission

---

**30.** This example is a variation of one presented by one of the petitioners. *See* Application of Consolidated Edison Company for Rehearing, FERC Docket No. RM79–15, J.A. 1638.

**31.** The only limitation on serving new agricultural demand is that the demand fall within contract and certification amounts. *See Order No. 29, Final Rule*, FERC Docket No. RM79–13 (May 2, 1979), J.A. 316–20. This limitation was upheld by the panel opinion in this case and was not vacated as part of this *en banc* proceeding. *See Process Gas II*, 694 F.2d at 749–51.

**32.** *Process Gas II*, 694 F.2d at 753.

**33.** *Id.,* at 778 (Wald, J., dissenting).

**34.** At oral argument, the Commission's counsel suggested that the "maximum extent practicable" language of section 401 only provides the Commission with authority to make adjustments to curtailment plans in accordance with section 502(c) of the NGPA, 15 U.S.C. § 3412(c). *See also* Brief for FERC on Petitions for Rehearing En Banc of Section "2–A" of the Court's July 29, 1981 Opinion at 24. Under section 502(c), the Commission may allow adjustments to any provision of the NGPA "as may be necessary to prevent special hardship, inequity, or an unfair distribution of burdens." We agree that section 502(c) provides

read out of the statute an important aspect of its responsibilities.

Section 401 plainly provides that essential agricultural uses need be assured second priority status only "to the maximum extent practicable."[35] In adding this qualifying language, the conference committee expressed its concern that the more rigid language of the House and Senate bills would deprive the Commission of much needed flexibility.[36] The conference committee

proceeded to suggest that a "practicable" means for incorporating agriculture's heightened priority into existing curtailment plans would be to retain existing base years—that is, to raise agriculture's priority *within* existing curtailment plans without opening up such plans to accommodate the natural gas needs of users not on board in the base period.[37] Notably, this proposed solution would have had *no* adverse impact on the highest priority grouping. Instead, a reordering of existing plans would have

---

the Commission with flexibility in implementing curtailment plans, but we fail to see how it informs our understanding of the practicability language in section 401. Especially since section 502(c) applies generally to the NGPA, while section 401 addresses the particular questions raised by curtailment plans, it is unlikely that Congress intended for section 502(c) to be the sole means by which the Commission could take advantage of the flexibility it wrote into section 401.

**35.** Section 401(a) provides:

Not later than 120 days after November 9, 1978, the Secretary of Energy shall prescribe and make effective a rule, which may be amended from time to time, which provides that, notwithstanding any other provision of law (other than subsection (b) of this section) *and to the maximum extent practicable,* no curtailment plan of an interstate pipeline may provide for curtailment of deliveries of natural gas for any essential agricultural use, unless such curtailment—

(1) does not reduce the quantity of natural gas delivered for such use below the use requirement specified in subsection (c) of this section; or

(2) is necessary in order to meet the requirements of high-priority users.

15 U.S.C. § 3391(a) (emphasis added). In accordance with this directive, the Department of Energy issued a rule providing that:

(a) Notwithstanding any provision of law other than section 401(b) of the Natural Gas Policy Act of 1978, or any other rule, regulation, or order of the Department of Energy, the Federal Energy Regulatory Commission or their predecessor agencies, *and to the maximum extent practicable,* no curtailment plan of an interstate pipeline may provide for curtailment of deliveries of natural gas for any essential agricultural use, unless:

(1) Such curtailment does not reduce the quantity of natural gas deliveries for such use below the use requirement certified by the Secretary of Agriculture under section 401(c) of the Natural Gas Policy Act of 1978 in order to meet the requirements of full food and fiber production; or

(2) such curtailment is necessary in order to meet the requirements of high-priority users; or

(3) the Federal Energy Regulatory Commission, in consultation with the Secretary of Agriculture, determines, by rule or order issued pursuant to section 401(b) of the Natural Gas Policy Act of 1978, that use of a fuel (other than natural gas) is economically practicable and that the fuel is reasonably available as an alternative for such essential agricultural use.

(b) Any essential agricultural user who also qualifies as a high-priority user shall be a high-priority user for purposes of paragraph (a) of this section.

(c) The specific relative order of priority for all uses and users of natural gas, including high-priority and essential agricultural uses and users, shall remain as reflected in effective curtailment plans of interstate pipelines filed with the Federal Energy Regulatory Commission to the extent that the relative order of priorities does not conflict with paragraph (a) of this section.

*Final Rule,* DOE/ERA Docket No. ERA–R–78–22 (Mar. 9, 1979), J.A. 75–76; 44 Fed.Reg. 15,-642, 15,646–47 (Mar. 15, 1979) (codified at 10 C.F.R. § 580.03) (emphasis added).

**36.** Both the House and Senate bills spoke in terms of "prohibiting" curtailment of essential agricultural users unless necessary to meet the requirements of high priority users. "[T]he conference agreement include[d] the term 'to the maximum extent practicable' to assure that the Commission [would have] the necessary flexibility in implementing any changes." H.R. Rep. No. 1752, 95th Cong., 2d Sess. 111–13 (1978), U.S.Code Cong. & Admin.News 1978, pp. 7660, 9027–29.

**37.** The conference report specifically stated that the conferees did "not intend the reopening of curtailment plans for [the] limited purpose [of bringing the schedule of priorities into conformity with the NGPA] to result in the adoption of a new base year for curtailment purposes." *Id.* at 113, U.S.Code Cong. & Admin.News 1978, p. 9030.

only affected the order in which priority groups *lower* than the highest priority grouping were to receive natural gas.

■ Although the conference report does not focus on the particular issue presented here [38]—namely, the scope of the Commission's authority when the Secretary explicitly determines that a current requirement methodology would best serve agricultural goals—it does suggest that the Commission unduly abdicated responsibility in this case. Critical for present purposes is that the

conference revisions sought to give the Commission flexibility so that it could integrate the new priority treatment for agriculture into existing curtailment plans without throwing those plans into disarray. Grafting a current requirements methodology onto a base period curtailment plan, however, could increase demand for natural gas to such a degree that it disrupts natural gas markets, and significantly increases the probability that new high priority users will be injured as a result of natural gas shortages.[39] Although an assessment of the like-

|  | Base Year Usage | Load Growth |
|---|---|---|
| Highest Priority | 50,000 | 25,000 |
| Agricultural Priority | 10,000 | 10,000 |
| Lowest Priority | 40,000 | 15,000 |
|  | 100,000 | 50,000 |

So long as the pipeline maintains a base year methodology, there should not be a significant incentive for load growth, and those customers who are added should share approximately equally in the hardship of curtailment. Therefore, if natural gas supplies drop to 125,000 units, new users should, on average, receive about 50 percent of their regular usage. If agricultural load growth receives priority treatment, however, two consequences follow. First, load growth in the other priorities is placed further down in the hierarchy for receiving natural gas during curtailment. In the example, if natural gas supplies drop to 125,000 units, there will be only 15,000 units of natural gas left over after serving those within the curtailment plan. Thus, the remaining users would receive on average 37.5 percent of their demand, rather than 50 percent. But, in addition, priority treatment for agricultural users might encourage further increases in natural gas demand for agriculture. If agricultural load growth doubled in our example, there would be only 5,000 units of natural gas to be divided up among new natural gas users, averaging out to about 12.5 percent of their regular usage—one-fourth of the amount they would receive if the base year methodology were retained.

Because the Commission did not analyze these possible consequences, we cannot assess whether their likelihood is sufficiently serious to warrant some limitation on the Secretary's certification in the interests of high priority users as reflected in the Commission's overall curtailment policy. Perhaps the problem of over-encouraging agricultural load growth to the point where this could happen is not serious, or may be controlled in some way other than to impose a base year methodology. We are not persuaded, however, that the problem may be ignored simply because section 401(b)

---

**38.** Indeed, the NGPA conference report together with the conference report discussing section 605 of the Public Utility Regulatory Policies Act, Pub.L. No. 95–617, 92 Stat. 3117 (codified at 15 U.S.C. § 717x) ("PURPA"), H.R.Rep. No. 1750, 95th Cong., 2d Sess. 113 (1978), leave the distinct impression that Congress never expected section 401 of the NGPA to lead to any changes in the base period methodology used in curtailment plans. Section 605 of PURPA assures that when base periods are updated, natural gas customers who have reduced their demand by conserving natural gas will not be penalized. In explaining this provision, the PURPA conference report stated that "[a] change in a curtailment plan *which does not require an updating of base period data,* such as the revision required in title IV of the Natural Gas Policy Act of 1978, would not trigger the application of this section." H.R.Rep. No. 1750, 95th Cong., 2d Sess. 113 (1978), U.S.Code Cong. & Admin.News 1978, p. 7847 (emphasis added).

**39.** Increased demand by agricultural users would have no impact on high priority users who were on board during the base period. Expansion of agricultural usage, however, would increase the probability that high priority users added onto the system after the base period will suffer curtailment. These users only receive natural gas after all of the users covered by the curtailment plan receive their natural gas. Thus, if a current requirements methodology encourages agricultural users to convert to natural gas, and substantially expands agricultural usage, new high priority users could suffer a greater risk of curtailment than the Commission considers desirable for its overall curtailment policy concerns. Under these circumstances, retention of the base period methodology for agricultural users may be a "practicable" means of protecting users in the highest priority group.

As an example, suppose that a pipeline currently supplies 150,000 units of natural gas, but supplied only 100,000 units in the base period. Further, suppose that the natural gas demand it serves may be broken down as follows:

lihood and scope of these consequences and the importance of avoiding them might still lead the Commission to decide that full implementation of the Secretary's current requirements methodology is nonetheless appropriate, the Commission made no such determination in this case. Instead it simply found itself "required by law"[40] to adopt the Secretary's certification, no matter what the consequences might be.[41]

Most disturbing in this case is that the Commission's narrow interpretation of its powers allows major curtailment decisions to be made without any analysis by any agency of the impact of those decisions on curtailment plans. Read together, the opinions of the Secretary and the Commission are reminiscent of Alphonse and Gaston.[42] In undertaking the task of certifying essential agricultural uses, the Department of Agriculture claims no responsibility to consider the consequences of its decision. "Nowhere," it states, "does section 401 direct USDA to focus upon pipeline curtailment plans."[43] Meanwhile, the Commission presents an interpretation of section 401 calling for complete deference to the Secretary's certification. The result of this dual denial of responsibility is a patchwork approach to curtailment policy that allows the needs of the second priority group to disrupt Commission policy geared to controlling instability in natural gas markets and protecting the interests of the higher priority users. This might occur even though it is long established in Commission practice that the growth needs of the *highest* priority grouping do not justify a blanket authorization of load growth.[44] Since this result is not dictated by the statute, and could well frustrate Congress' manifest concern with protecting the needs of the highest priority group, we are loath to read section 401 as leaving no agency with responsibility to assess the consequences of fully incorporating a current requirements methodology. Given the Commission's traditional expertise in fash-

---

assures that there will be some disincentive to load growth. Section 401(b), which provides that essential agricultural users will not receive priority status if there are "economically practicable alternatives," does not require agricultural users to rely on high priced alternative fuels. *See* H.R.Rep. No. 1752, 95th Cong., 2d Sess. 114 (1978). Agricultural users relying on high priced alternative fuels may therefore have an incentive to switch to natural gas if they could be assured of supplies during curtailment, and new agricultural users may choose to rely on natural gas in their original installations. The Commission's responsibility is to assess the likelihood of these events, and the seriousness of their consequences for high priority users, so that it can adjust its implementing methodology accordingly.

**40.** *Order Denying Rehearing on Interim Curtailment Rule,* FERC Docket No. RM79–13 (June 20, 1979), J.A. 257.

**41.** A number of parties have argued that full implementation of the Secretary's certification is "practicable" because agricultural uses make up a small portion of natural gas demand. *See, e.g.,* Joint Brief of Petitioners on Rehearing, Midwestern Gas Transmission Co., East Tennessee Natural Gas Co., Alabama Gas Corp., Air Products and Chemicals, Inc., Stauffer Chemical Co., Williamette Industries, Inc., and Southern Natural Gas Co. at 14; Brief for the United States Department of Agriculture on Rehearing En Banc at 8. Furthermore, they suggest that the experience of the last two years demonstrates that the Commission's approach will not lead to any untoward consequences. We recognize that these arguments may have some bearing on the Commission's ultimate decision whether to implement the Secretary's certification without change. In determining whether full implementation is "practicable," however, the Commission must look not only at agriculture's current share of the natural gas market, but also at the likely increase in that share. In addition, the Commission's assessment of the recent experience of the natural gas market should take account of the relative abundance of natural gas in recent years.

**42.** Alphonse and Gaston, comic strip characters created by Frederick B. Opper, displayed excessive politeness and deference to each other in the face of crises by uttering the phrases: "After you, my dear Gaston," and "After you, my dear Alphonse." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 63 (1976).

**43.** Original Brief for the Department of Agriculture and the Department of Energy at 47.

**44.** *See Order No. 29, Final Rule,* FERC Docket No. RM79–15 (May 2, 1979), J.A. 315; Brief for FERC on Petitions for Rehearing of Section "2–A" of the Court's July 29, 1981 Opinion at 17–20.

ioning curtailment plans, and the statute's explicit provision that incorporation of the Secretary's certification may be conditioned on grounds of practicability, we have no doubt that the Commission is the most appropriate agency to perform this task.[45]

In reaching this conclusion, we reject the Department of Agriculture's argument that partial implementation of the Secretary's certification would render the Secretary's certification a nullity.[46] Fulfillment by the Commission of its statutory responsibility to assess the practicability of implementing methodologies, will not undermine the fundamental task assigned to the Secretary: namely, to identify agricultural uses that are "essential" and to assess what proportion of its natural gas demand an agricultural user must receive to allow for full food and fiber production.[47] Although the Secretary's certification might be modified in accordance with considerations of practicability and the needs of high priority users, these modifications would reflect factors that the statute requires be accounted for and that the Secretary has neither the expertise nor the willingness to take into account in his certification decision. So long as the Commission recognizes that it has no authority to reassess the needs of agriculture, and modifications of full implementation are rationally based on an assessment of the practicability of full implementation and its impact on the legitimate needs of high priority users as the Commission defines them, the Commission would properly act within its statutory bounds.

Nor do we agree with the Department's suggestion that we should defer to the Commission's interpretation of its responsibilities, in accordance with the traditional deference afforded to an agency charged with administering its governing statutes.[48] The extent to which courts should defer to agency interpretations of law is ultimately "a function of Congress' intent on the subject as revealed in the particular statutory scheme at issue."[49] Thus, when Congress delegates full responsibility to an agency to implement a statute, but provides little guidance on how the governing statute should be interpreted, common sense suggests that Congress would wish courts to consider agency views on questions of law that are "closely related . . . to the everyday administration of the statute and to the agency's administrative or substantive expertise."[50] Indeed, in some cases, administrative interpretations might be deserving of "legislative effect."[51]

---

**45.** As we observed in *Process Gas Consumers Group v. Department of Agriculture*, 657 F.2d 459, 467 (D.C.Cir.1981) (*"Process Gas I"*), "[t]he Secretary of Agriculture, unlike the Federal Energy Regulatory Commission, does not have responsibility for balancing the various competing interests affected by the [NGPA]." The Commission is therefore the agency most suited to determining whether superimposing the Secretary's certification on existing curtailment plans is "practicable."

**46.** Brief for the United States Department of Agriculture on Rehearing En Banc at 8.

**47.** It is up to the Department of Agriculture to determine how much of agricultural demand may be deemed "essential." The Department could determine, for example, that fifty percent of natural gas demand is "essential" to keep broilers from freezing or milk from being dumped. Depending on the amounts certified as "essential" and the degree to which agricultural demand for natural gas has grown, implementation of the Secretary's certification may be largely compatible with existing base period methodology. It is primarily because the Department insisted upon one hundred percent of current requirements that the base year issue was catapulted into such prominence.

**48.** See *Blum v. Bacon*, —— U.S. ——, ——, 102 S.Ct. 2355, 2362, 72 L.Ed.2d 728 (1982); *Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 36–43, 102 S.Ct. 38, 44–47, 70 L.Ed.2d 23 (1981).

**49.** *Constance v. Secretary of Health & Human Services*, 672 F.2d 990, 995 (1st Cir.1982). When an agency interpretation is longstanding, the case for deference may be heightened by the possibility of congressional acquiescence. See, e.g., *Kirkuff v. Nimmo*, 683 F.2d 544, 550 (D.C.Cir.1982).

**50.** *Constance v. Secretary of Health & Human Services*, 672 F.2d at 995.

**51.** An administrative interpretation is entitled to "legislative effect" when Congress explicitly delegates authority to "give substance" to a

The underlying logic for deference, however, largely depends on the agency having "primary responsibility"[52] for administering a statute, so that its interpretation may fairly be characterized as being infused with the agency's expertise. In this case, the Commission *concedes* that its reading of section 401 of the NGPA is not informed by notions of how best to implement national curtailment policy.[53] Instead, the Commission simply asserts that under the language and history of the statute, its hands are tied, no matter how disastrous the implications of its interpretation. But even the Commission must acknowledge that its shifting interpretation of its statutory authority bespeaks of an ambiguity in the statute's language and legislative history.[54] Under these circumstances, courts have an undeniable responsibility to determine whether the agency has construed its powers too narrowly.[55]

### CONCLUSION

By narrowly interpreting its authority under the NGPA, the Commission may have allowed agricultural load growth to squeeze out new high priority users without any assessment of whether that result is compatible with overall curtailment policy. In this opinion, we hold that section 401's practicability language gives the Commission flexibility to adjust the Secretary's certification when so doing will appropriately advance the interests of high priority users.

Because the Commission considered itself powerless to follow any course other than full implementation of a current requirements methodology for agricultural users, we remand for further proceedings.

### APPENDIX

#### ORDER GRANTING REHEARING
*EN BANC*

Order granted November 13, 1981.

Before ROBINSON, Chief Judge, WRIGHT, TAMM, MacKINNON, ROBB, WILKEY, WALD, MIKVA, EDWARDS and GINSBURG, Circuit Judges.

Order PER CURIAM.

PER CURIAM:

Suggestions for rehearing have been filed by the following parties:

(1) Southern Natural Gas Company

(2) Midwestern Gas Transmission Company and East Tennessee Natural Gas Company

(3) Washington Gas Light Company

(4) United Distribution Companies and the Brooklyn Union Gas Company

(5) United Gas Pipe Line Company

(6) Alabama Gas Corporation

(7) The State of Louisiana

(8) Process Gas Consumers Group, American Industrial Clay Company of Sandersville, and Georgia Kaolin Company

---

statute's terms. *Herweg v. Ray*, 456 U.S. 265, 274–75, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 131 (1982); *see Batterton v. Francis*, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977).

**52.** *See Federal Election Comm'n v. Democratic Senatorial Campaign Comm.*, 454 U.S. at 37, 102 S.Ct. at 45 (quoting *Buckley v. Valeo*, 424 U.S. 1, 109, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976)) ("[t]he [Federal Election] Commission is precisely the type of agency to which deference should presumptively be afforded. Congress has vested the Commission with 'primary and substantial responsibility for administering and enforcing the Act'"); *Kirkuff v. Nimmo*, 683 F.2d 544, 549 (D.C.Cir. 1982). Arguably, the joint interpretation of several agencies as to how to divide their responsibilities should also be accorded deference. The problem in this case, however, is that the responsibility of assessing the impact of full implementation of the Secretary's cer-

tification on high priority users has not been assumed by any agency. *See* text accompanying notes 42–44 *supra*.

**53.** *See* Brief for FERC on Petitions for Rehearing En Banc of Section "2–A" of the Court's July 29, 1981 Opinion at 26–27.

**54.** *See* text accompanying notes 16–28 *supra*.

**55.** *Cf. FPC v. Conway*, 426 U.S. 271, 279, 96 S.Ct. 1999, 2004, 48 L.Ed.2d 626 (1976) (FPC erroneously concluded that it lacked jurisdiction to consider "price squeeze" issues); *Elizabethtown Gas Co. v. FERC*, 575 F.2d 885, 887–89 (D.C.Cir.1978) (FPC erroneously concluded that it was powerless, as a matter of law, to order compensation to natural gas customers curtailed by more than the system average).

On consideration of the foregoing, it is

ORDERED by the Court *en banc* that the aforesaid suggestions are granted and, it is

FURTHER ORDERED by the Court *en banc* that Sections I.C and II.A of the Court's opinion, and the corresponding parts of the judgment of the Court, both issued on July 29, 1981 be, and the same hereby are, vacated.

The Court will issue an order to govern further proceedings in these cases at a later date.

MacKINNON and ROBB, Circuit Judges, would deny the suggestions for rehearing *en banc.*

WRIGHT and TAMM, Circuit Judges, did not participate in this order.