CHARLES A. JUDEN AND CLEO M. JUDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Juden v. Commissioner
Docket No. 40595-84.
United States Tax Court
T.C. Memo 1987-302; 1987 Tax Ct. Memo LEXIS 302; 53 T.C.M. (CCH) 1154; T.C.M. (RIA) 87302; June 22, 1987. John L. Oliver, Jr., for the petitioners. James A. Kutten, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: In a statutory notice of deficiency, dated September 13, 1984, respondent determined *303 a $121,389 income tax deficiency for petitioners' 1979 taxable year. The entire deficiency is attributable to respondent's proposed disallowance of a substantial amount of basis claimed in connection with a purported sale of realty during 1979. The controversy over the deficiency has generated the following issues [1] for our consideration: (1) Whether a sale of the realty occurred during the 1979 taxable year and if a sale occurred, the amount of sales proceeds realized by the seller, (2) whether realty is valued at the date of death of the grantor of a testamentary special power of appointment or upon the lapse of the power at the date of death of the holder of the power and (3) the value of the realty at the appropriate valuation date. *304 FINDINGS OF FACT Some of the facts have been stipulated and are incorporated by this reference. Charles A. Juden (Charles) and Cleo M. Juden (collectively to be referred to as "petitioners") for all pertinent years were husband and wife and resided at Cape Girardeau, Missouri, including the time of filing their petition in this case. Petitioners filed their 1979 Federal income tax return on the cash basis method of accounting and on a calendar year reporting period. On November 19, 1979, petitioners entered into a contract for sale of certain realty located in Cape Girardeau, Missouri, which, among other parcels, included 162 acres in U.S. Survey 176, the subject matter and focal point of the issues in this case. [2] As recited in the contract, petitioners were the sellers and their children were the buyers. [3] At the time of executing the contract for sale, Charles was 78 or 79 years old and we assume that his children had all attained their majority. The stated purchase price was $720,000. All of the referenced realty was subject to a deed of trust to Kansas City Life Insurance Company in the original amount of $750,000 [4] with an outstanding balance of $720,000 on November 19, 1979. *305 The buyers (children) agreed to assume the $720,000 balance of the deed of trust and to hold petitioners harmless on the note. No further consideration was recited in the contract for sale. Also on November 19, 1979, petitioners executed a general warranty deed conveying the realty, which deed was recorded with the Recorder of Deeds of the County of Cape Girardeau, Missouri, on December 19, 1979. On April 20, 1981, one of the children transferred her interest in the realty to a "voluntary trust" and on December 29, 1981, all three of the children *306 (or their trusts) executed a warranty deed to petitioners reconveying the realty to petitioners. Said warranty deed was recorded with the Recorder of Deeds of the County of Cape Girardeau, Missouri. The records of the Real Estate Assessor's Office, County of Cape Girardeau, Missouri, reflected Charles as owner of the realty for 1979, the children as owners for 1980 and 1981 and petitioners as owners for 1982. Petitioners reported $20,814 of long-term capital gain from the sale of the realty on their 1979 Federal income tax return which they computed, as follows: Sales Price
$720,000
Less: Sales Commission
43,200
Adjusted Sales Price
$676,800
BASIS OF PROPERTY SOLD [5]
U.S. Survey 787 - 83 acres
$2,800
U.S. Survey 319 - 101 acres
1,000
U.S. Survey 176 - 162 acres
611,611
Depreciable Improvements
2,983
Nondepreciable Improvements
37,592
TOTAL BASIS
655,986
LONG-TERM CAPITAL GAIN REPORTED
$20,814
Respondent disallowed all but $6,480 of the basis claimed for U.S. Survey 176 and allowed some additional amounts (as set forth in footnote 5) to arrive at a long-term capital gain of $606,372, which is the underlying adjustment which *307 gave rise to the income tax deficiency in controversy. *308 The 162 acres of U.S. Survey 176 (realty) was the subject of a dispute within Charles' family ending in a 1935 compromise under which Charles' maternal grandmother became the record title holder and owner. [6] Although Charles' grandmother owned the realty, it was not included in the inventory or "appraisement" in the probate of her estate or upon her Federal estate tax return after her death on November 10, 1944. The realty was mentioned, however, in Paragraph 4 of her will, wherein it was devised to Charles' maternal uncle for life with a testamentary "limited power of appointment." [7] Said uncle died on September 16, 1960, without exercising the "limited power of appointment" and without mention of the realty in his will. [8] Upon the failure of the exercise of the "limited power of appointment," Charles received ownership and title to realty through the will of his maternal grandmother. *309 Acreage in realty was valued at $61.22 an acre in Charles' maternal grandfather's Federal estate tax return, following his death in February 1925. Acreage in adjacent U.S. Survey properties included in Charles' maternal grandmother's Federal estate tax return (reflecting a November 10, 1944, date of death) were valued in a range from $25 to $71 per acre. The value utilized for 1944 by the county tax assessor for U.S. Survey 176 was $47.41 per acre. Kansas City Life Insurance Company arranged for an appraisal of realty in connection with the 1973 loan to petitioners. The land was appraised, as of October 1973, as "farm property" at $1,416 per acre. U.S. Survey 176 is a rectangular piece of land consisting of approximately 200 acres, only 162 of which are involved in this case. It is located in the northeast quadrant of the intersection of Missouri Highway 74 and Interstate Highway 55 which exists in the location of former Federal Highway 61, which was the main north-south road during 1944 and 1960. Prior to 1960 there was a road that ran either adjacent to or through part of realty. Additionally, there is a railroad line that runs relatively close and basically parallel to the *310 southern border of realty. Some operating limestone quarries with marketable limestone are in the immediate vicinity of realty. [9] There was a market for limestone in Southeast Missouri during 1944 and 1960. The area produced 4,856,540 short tons of limestone with a value of $5,312,384 ($1.09 per ton) during 1944 and 27,180,000 short tons with a value of $37,878,000 ($1.39 per ton) during 1960. Limestone is generally found in three strata or layers in the Cape Girardeau area. The top layer is called "plattin," which is the best quality because it is chemically purer and suitable for high grade aggregate, portland cement, concrete, aggregate for road paving and agricultural purposes. The middle layer is of lower quality and is called "peckatonica." The chemical impurities in peckatonica may limit its use for cement, but it is usable for the other purposes for which plattin is used. The bottom layer is called "joachim" which is generally not *311 suitable for cement, but may be used for gravel paving and agricultural purposes. The value of a particular parcel of land for its limestone content may depend upon the following factors: (1) The thickness of the various layers of stone, (2) the overburden depth and cost of its removal, (3) whether there is a market for the limestone and the proximity of the market, (4) the accessibility of the limestone and its proximity to transportation to the market and (5) other miscellaneous factors, including weathering of the stone, faults and other physical conditions. Charles was born in 1901 and has always lived in the Cape Girardeau area. Charles' family has operated five different limestone quarries in the Cape Girardeau area and he has been involved in and is familiar with such operations. During the early 1920's Charles was employed by Marquette Cement Company in Cape Girardeau. Charles was the engineer in charge of construction and operating the quarries. His duties involved, among other things, the purchase and processing of stone and the location of suitable quarry areas. During the 1930's, Charles operated a large lime producing plant at Grays Point on the Mississippi River. *312 During the 1940's Charles sold a four or five-acre operating quarry at Grays Point (which is about four miles from realty) for about $10,000 per acre. Throughout his life, Charles has leased quarries on behalf of his family and himself. Charles believes that in valuing limestone bearing property, the factor to be used as the price of limestone in place in Cape Girardeau has consistently been between $ .03 and $ .05 per ton, depending upon the overburden and its cost of removal. The overburden in the area of realty had a maximum depth of 25 feet with a large amount of the surveyed area classified in the five to twenty-foot range. Charles has never observed or tested for the actual maximum depth of the limestone located in U.S. Survey 176, but based upon his observations of the exposed rock and experience he concluded that the depth of limestone is a "minimum of 100 feet." Charles' conclusion is, in part, based upon drillings made on adjacent properties and his accumulated knowledge about the land. The limestone on U.S. Survey 176 is exposed (unburdened) in only a few places. When Charles was a youngster (early in the century) he utilized U.S. Survey 176 limestone to make lime *313 by a burning process. The lime was sold to local farmers for whitewash and other purposes on a part-time basis. Other than this limited use, U.S. Survey 176 limestone was never commercially utilized for quarrying limestone [10] and there is no established quarry on the property. One area of the property which has an exposed outcropping of limestone had been filled with water and used as a small lake or pond. This area approximates eleven acres. Additionally, a fissure or fault line runs through U.S. Survey 176. Water may have a harmful effect on the quality of limestone for commercial purposes. U.S. Survey 176 could have been used as a quarry either in 1944 or 1960. There was a market for limestone in the Cape Girardeau area in 1944 and 1960. OPINION The 1979 Transaction
We are confronted with a factual situation where petitioners seek to deny the form of the transaction that they designed and executed. [11] Although there are contracts, deeds, recordings and other clear evidence of transfer of realty ownership from petitioners to their *314 children during 1979, petitioners argue that: (1) "the 'Agreement for Sale of Real Estate' was not a valid enforceable contract * * * void or voidable on its face for want of mutuality." Petitioners argue simply that the contract was executory as it related to the children for they were to assume the payment of the debt underlying the first deed of trust, but had not met that obligation during 1979. (2) Under the Agreement for Sale of Real Estate the buyers (children) had a right of cancellation during the first four years of ownership which could be exercised by giving the sellers (petitioners) written notice of same on April 1 of any year through April 1, 1983. *315 Section 1001[12] provides that gain shall be the excess of the amount realized over the adjusted basis of property. The buyer's assumption of a seller's mortgage obligation on realty sold or exchanged has long been considered part of the proceeds of sale (amount received) by the seller. Crane v. Commissioner,331 U.S. 1 (1947); Hays v. Commissioner,13 B.T.A. 291 (1928). [13] We do not agree with petitioners' interpretation which essentially would label any noncash transaction as conditional and unrealized because the buyer may not satisfy the terms of the debt obligation during the year of the sale or exchange. In this case, the "buyers" assumed the $720,000 outstanding balance of the first mortgage obligation and agreed to hold the "sellers" harmless with regard to that obligation. Furthermore, the agreement for sale recited that the sale price was $720,000 and that was the only consideration referenced. Accordingly, we find that the children's assumption of the first mortgage caused petitioners to realize $720,000 in proceeds from the sale or *316 exchange of a portion of realty during 1979. Both parties direct our attention to an Eighth Circuit Court of Appeals case regarding the effect of the cancellation clause in the agreement for sale. Laclede Gas Co. v. Amoco Oil Co.,522 F.2d 33 (8th Cir. 1975). [14] In that case one of the two parties to a contract possessed a right to cancel [15] and the lower court held that the contract was "void for lack of mutuality." The Circuit Court reversed, holding that *317 "A bilateral contract is not rendered invalid and unenforceable merely because one party has the right to cancellation while the other does not." The Circuit Court refined the general principle by establishing the standard or criteria for measuring whether a particular right of cancellation may affect the validity of contract, as follows: "The important question * * * is whether [the] right of cancellation rendered all [of the holder's] promises in the agreement illusory so that there was a complete failure of consideration." (Emphasis omitted.) Laclede Gas Co. v. Amoco Oil Co.,supra at 36-37. In reaching its holding, the Circuit Court reasoned that the right to cancel involved was neither arbitrary nor unrestricted because there were restrictions as to time and conditions precedent (providing written notice only at a specified time) to use of the right of cancellation. In other words the holder of the right of cancellation was required to unconditionally perform under the provisions of the contract unless and until they properly exercised their right. *318 Petitioners contend that their children's right of cancellation was unrestricted and absolute and therefore that the agreement for sale was invalid. Respondent contends that the children's right of cancellation was not unrestricted and that they were permitted to provide written notice only on a specific day each year for four years only before the children become entitled to exercise their right of cancellation. We agree with respondent and further note that the buyers were unconditionally obligated to perform under the agreement for sale from time of its execution during November 1979 until April 1, 1980, and then until April 1, 1981, etc. [16] We hold that petitioners sold the property in question to their children for $720,000 during 1979. Date to Be Used for Valuation
Generally, the basis of property acquired *319 from a decedent is the fair market value at the date of the decedent's death. Sec. 1014(a)(1). Petitioner contends that the 162 acres of realty should be valued as of September 16, 1960, when the holder of the "limited power of appointment" died without executing the power, thereby allowing it to lapse. Respondent contends that the property should be valued as of November 10, 1944, when the grantor of the "limited power of appointment" died, because petitioner (Charles) received his interest from the earlier estate upon the lapse of the power. Petitioners' position is presented on brief, as follows: Under the Missouri Fee Tail Statute, the bequest of [Charles' maternal grandmother] to [his maternal uncle] in Paragraph 4 of her will gave [Charles] a "substitutional contingent remainder," a remainder following the contingent remainder of a fee tail and subject to a condition precedent. * * * Therefore, the right acquired by [Charles] was a "springing or shifting executory interest" which neither vested or conveyed title until the happening of the contingent event. That being the case, the correct valuation date would be the date of death of [Charles' maternal uncle *320 who failed to execute the "limited power of appointment"], i.e., the date on which the contingent event occurred. Respondent argues that the case law and statute require valuation at date of decedent's death, November 10, 1944. Respondent, citing Helvering v. Reynolds,313 U.S. 428 (1941); Brandeis v. United States,251 F.2d 719 (8th Cir. 1958); and Davenport v. Commissioner,6 T.C. 62 (1946), appropriately points out that in spite of earlier versions of the Internal Revenue Code worded more favorably to petitioners' position, earlier court opinions held that valuation relates back to the decedent's date of death, even though the recipient's enjoyment and possession of the property was delayed because of intervening interests, the passage of time or some other condition or impediment. [17] Moreover, the language of section 1014(a)(1) leaves no room for doubt because the phrase "at the time of acquisition" has been replaced by "at the time of the decedent's death." See also section 1.1014(a)(2), Income Tax Regs. Although we appreciate petitioners' technical explanation of the conditional nature of Charles' *321 interest at the time of his maternal grandmother's death (November 10, 1944) and recognize that Charles was not entitled to its use, enjoyment or possession until the time of his maternal uncle's death and failure to exercise the power (September 16, 1960), the valuation of the property and hence the determination of petitioners' basis must relate to the estate from which the property interest was acquired. Our determination herein is in accord with Jewett v. Commissioner,455 U.S. 305 (1982), which involved an analogous issue -- which date is appropriate to begin testing the timeliness of a disclaimer. Jewett involved a testamentary trust and four generations of Jewetts. The "Jewett taxpayer" (disclaimant) was in the third generation and if he survived, his mother was to receive a share of the trust corpus. If he predeceased his mother, his share would be distributed to his issue. The trust was created in 1939 and the disclaimer occurred in 1972. The Supreme Court held that the appropriate event for testing the timeliness of a disclaimer was the creation of the interest, not the subsequent vesting or distribution of the trust corpus. In a similar vein, *322 we have concluded that a basis to be determined as of the date of death of the creator of the interest is appropriate here. Section 1014 includes the general rule that basis is determined at death and we have found no subsequent event which would cause the basis to be increased. Accordingly, November 10, 1944, shall be the valuation date for the 162 acres of realty. The Value on November 10, 1944
Petitioners claimed a basis *323 of $611,611 (approximately $3,775 per acre) for the 162 acres of realty on their 1979 Federal income tax return. Respondent in the statutory notice of deficiency determined that the 162 acres had a value of $6,480 ($40 per acre). On brief, petitioners contend that the property's best and highest use was as a limestone quarry and that its value [18] (and accordingly petitioners' basis) was $603,911. Petitioners' computation is accomplished based upon their conclusions that: (1) The property contained sufficient acreage to support a 55-acre quarry. (2) The usable limestone was 100 feet in depth. (3) Limestone weighs a minimum of 3,542 tons per acre foot or 354,200 tons per acre with a 100 feet depth. (4) The price per ton of limestone in the Cape Girardeau area averaged between $ .03 and $ .05 per ton. Petitioners' "formula" for computing value could be expressed, as follows: 3,542 X 100 X .03 X 55 = $584,430. [19]
*324 Respondent has argued that on November 10, 1944, the property had a value of $40 per acre ($6,480 for 162 acres) and that the property's highest and best use was not as a limestone quarry. Respondent's argument rests upon three concepts: (1) Other property, which appears to be either adjacent or similar to U.S. Survey 176 was valued as of November 10, 1944, in Charles' maternal grandmother's estate at amounts between $25 and $71 per acre and the local tax assessment [20] reflected the property at about $47 per acre. (2) Respondent's mining engineer concluded that there was "zero value" in mineral deposits on U.S. Survey 176. (3) The petitioners have not sustained their burden of proof. *325 Respondent has not drawn a meaningful connection between the values of adjacent property and U.S. Survey 176 to utilize them for purposes of comparative value. Respondent's mining engineer's report is of no value in this case for it merely recites that there is "zero value" in the limestone, but there are no empirical or meaningful reasons cited for this conclusion, other than it had not been proven to the engineer. The respondent's engineer did not reach his conclusion based upon his observations, but the failure of others (in the engineer's relatively unexplained opinion) to show the existence of limestone. See also footnote 5, supra. Petitioner must overcome the presumption of correctness which attaches to respondent's notice of deficiency. We are left with Charles A. Juden's testimony as the determinative factor in our consideration of whether petitioners have sustained their burden of showing they are entitled to a value of more than $40 per acre for the 162 acres of realty. Charles possesses sufficient experience, background and education to qualify as an expert on the location, type and value of limestone deposits in the Cape Girardeau area. Charles also possesses *326 expertise in the commercial operation and value of limestone quarries. Additionally, opinion testimony by a lay witness is sanctioned under Rule 701 of the Federal Rules of Evidence. More specifically, an owner is competent to testify as to the value of his property. Klapmeier v. Telecheck International, Inc.,482 F.2d 247 (8th Cir. 1973). The fair market value of property reflects the highest and best use of the property on the relevant valuation date. Any realistically available special use of property due to its adaptability to a particular business is an element that must be considered in determining the fair market value. Mitchell v. United States,267 U.S. 341, 344-345 (1925); Hilborn v. Commissioner,85 T.C. 677, 688 (1985). Further and as we explained in Stanley Works v. Commissioner,87 T.C. 389, 400 (1986): "The fair market value of property is not affected by whether the owner actually has put the property to its *327 highest and best use. The realistic, objective potential uses for property control the valuation thereof." See United States v. Meadow Brook Club,259 F.2d 41, 45 (2d Cir. 1958). One court commented on this principle of valuation many years ago as follows: The landowner "may have used a valuable corner [of property] for a stable or for a pigsty * * * [b]ut he is not obliged to have it priced on that basis." Central Georgia Power Co. v. Stone,139 Ga. 416, 419, 77 S.E. 565, 567 (1913). Valuation issues are factual and judgmental, an inexact science, at best. Hamm v. Commissioner,325 F.2d 934, 940 (8th Cir. 1963), affg. a Memorandum Opinion of this Court; Georgia Kettleman Trust v. Commissioner,86 T.C. 91, 98 (1986); Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 452 (1980). We have carefully reviewed and considered the record in this case. We conclude and hold that the 162 acres in U.S. Survey 176 had a fair market value of $1,000 per acre or a total value of $162,000 on November 10, 1944. In reaching our conclusion, we relied most heavily upon the testimony of Charles A. *328 Juden. We found him to be candid, truthful and of a high level of expertise concerning all aspects of limestone quarrying activity. For more than 50 years Charles has managed and operated five quarrying operations in the Cape Girardeau area, been qualified and educated as an engineer, bought and sold limestone quarries, and valued sites for purposes of commercial limestone production. He has also accumulated extensive personal knowledge of U.S. Survey 176 and the surrounding area. Charles testified that U.S. Survey 176 contained a minimum of 100 feet of commercial quality limestone. [21] Respondent does not accept this estimate of the depth and argues that the depth cannot be determined without actual borings. Charles referenced borings on adjacent property, several nearby commercial quarrying operations with established deposits, and topographical and geographical maps which reflect the general existence and depth of limestone in the immediate area. [22] We find Charles' estimate of the depth reasonable. *329 Petitioners valued the property as though it was operating or operable as a quarry. Respondent points out that no established quarry exists upon the property and that farming was the only commercial purpose to which the property has been put (with the limited exception of Charles' burning of limestone early in the century). [23] Petitioners, however, have shown that the property had potential as a quarrying operation, through the following factors: (1) The limestone, which is exposed in two locations on the property, is refineable for commercial purposes. (2) There is reasonable access to highways and railroads for shipment to market. (3) There was a market for limestone in the Cape Girardeau area during 1944. We generally agree with petitioners' reasons in support of a finding that the property's best and highest use was as a limestone quarry, but we have discounted their proposed valuation because of the following factors: (1) The fault running through U.S. Survey 176 and water collected may have "contaminated" or affected the *330 marketability of some of the limestone. (2) The record is somewhat unclear regarding the amount of overburden that would have to be removed to permit quarrying of the limestone. (3) The accessibility to highway and railroad transportation available in 1944 was relatively close, but not as direct as that available for established quarries which had direct access to highways, railroads or rivers. (4) Petitioners had not taken into account the start-up costs, including site preparation, grading, paving and other factors that may be required in an operating quarry. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. Petitioners have also questioned whether the presumption of correctness that attaches to respondent's determination in the statutory notice is lost once a taxpayer introduces evidence which may support a contrary determination. The gist of petitioners' position is that they need only supply enough evidence to support a contrary determination or finding and that would shift the burden of proof to respondent because of the loss of the presumption of correctness. We believe that petitioners have confused the concept of the overall burden of proof with the burden of going forward with the evidence. In this case the overall burden of proof is on the petitioners. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a) of the Court's Rules of Practice and Procedure. Once petitioners have come forward with evidence, the respondent may then have the burden of going forward with the evidence, but the presumption does not disappear and the overall burden of proof does not shift to respondent, but remains upon petitioners. Rockwell v. Commissioner,512 F.2d 882, 885 (9th Cir. 1975), affg. a Memorandum Opinion of this Court. This is not the type of situation, as petitioners suggest, where respondent's determination is arbitrary or capricious. For example, see Jackson v. Commissioner,73 T.C. 394↩ (1979).
2. The contract for sale included 83 acres in U.S. Survey 787, 101 acres in U.S. Survey 319 and 162 acres in U.S. Survey 176. ↩
3. The children specifically named as buyers were: (1) Carl G. Meyer, Trustee of the Julia J. Buerkle Voluntary Trust Agreement of May 2, 1975, (2) Charles A. Juden, Jr., and Jeanette H. Juden and (3) Jill J. Ligon. ↩
4. The deed of trust was to secure a $750,000 loan in Oct. 1973 from the life insurance company to petitioners. There was another charge against the realty in the form of a second deed of trust to a bank in the amount of $300,000 for which petitioners retained the responsibility of repayment.↩
5. In the statutory notice of deficiency, respondent allowed additional amounts of basis with respect to property other than U.S. Survey 176 and additional amounts for improvements and legal fees as follows: U.S. Survey 787 - 83 acres
$ 2,908
($35.03 per acre)
U.S. Survey 319 - 101 acres
4,399
($43.55 per acre)
U.S. Survey 176 - 162 acres
6,480
($40.00 per acre)
Depreciable Improvements
2,983
Nondepreciable Improvements
38,658
Legal Fees
15,000
TOTAL BASIS
$70,428
For purposes of this case, petitioners have conceded that the values per acre determined by respondent for U.S. Surveys 319 and 787 are correct. Respondent offered the report of a mining engineer, who was a regular employee of respondent, which assigned a "zero value" to the mineral deposits on U.S. Survey 176 based upon the fact that the engineer possessed "no factual evidence to indicate any commercially marketable limestone" existed on petitioners' property. We find respondent's mining engineer's report to be of little or no value because he concluded that limestone did not exist because, essentially, no one had shown that it existed. Respondent's witness and his report do not reflect appropriate research and methodology to support the conclusion that "zero value be assigned to the mineral deposits" or that no deposits existed on the realty.↩
6. The record contains deeds going back as far as 1869 which reference U.S. Survey 176 conveyances in Charles' family. The basic confusion appears to be whether Charles' maternal grandfather (deceased during 1925) or maternal grandmother owned the realty. For purposes of this case the parties agree that Charles' maternal grandmother owned the realty at the time of her death, Nov. 10, 1944. ↩
7. For purposes of this case we assume that a "limited power of appointment" is the same as a "special power of appointment" as opposed to a "general power of appointment." This assumption finds further support in the respondent's private letter ruling that Charles' uncle's estate was not required to include the U.S. Survey 176 property as an asset of the estate. ↩
8. Charles was the executor of his uncle's estate, and as such, he obtained a private letter ruling from the Internal Revenue Service to the effect that U.S. Survey 176 realty was not includible in Charles' maternal uncle's estate.↩
9. The operating quarries in the area had immediate access to highway, rail or water for the purpose of transporting limestone to customers. This was reflected in an aerial map of the Cape Girardeau area (Exhibit 23-W) and testimony.↩
10. There is some indication that the land was commercially utilized for farming through and including the years 1944 and 1960.↩
11. It has become more common for taxpayers to attempt to avoid the form of their own transaction and we recently addressed the "ground rules" for such pursuits in Coleman v. Commissioner,87 T.C. 178, 201-202 (1986), on appeal (3d Cir., March 10, 1987), as follows: We think it important to note that, in the instant case, it is the taxpayer and not the Government which seeks to disavow the form of the transaction. As we observed in Bolger v. Commissioner,59 T.C. 760, 767 n. 4 (1973): "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted. * * *" (Citations omitted.) We went on to indicate that the taxpayer's lack of freedom is especially acute where the form was adopted to achieve a permissible tax purpose. The taxpayer's burden of proof may be intensified in these situations. See discussion in Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967) revg. and remanding 44 T.C. 549 (1965). Although the parties have not touched on this point one might conjure that petitioners (Charles was 78 or 79 years old in 1979) may have been attempting to reduce the size of their estates by the sale of the property to their children.↩
12. All section references are to the Internal Revenue Code of 1954 and in effect for the year in issue and all rule references are to this Court's Rules of Practice and Procedure. ↩
13. Regulations were issued during 1980 under sec. 1001, I.R.C. 1954, stating that "amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition." Sec. 1.1001-2(a)(1), Income Tax Regs.↩
14. Laclede Gas Co. v. Amoco Oil Co.,522 F.2d 33↩ (8th Cir. 1975) involves the interpretation of Missouri law and any appeal of the parties in this case would normally be to the Eighth Circuit Court of Appeals. See sec. 7482(b)(1)(A).
15. The cancellation language, in pertinent part, reads as follows: "Agreement shall remain in effect for one (1) year following the first delivery * * * [and] shall automatically continue in effect for additional periods of one (1) year each unless * * * prior to the expiration of the initial one (1) year period or any subsequent one (1) year period * * * written notice of termination [is given by Laclede to Amoco]." Laclede Gas Co. v. Amoco Oil Co.,supra↩ at 36.
16. There is no evidence in the record indicating whether the children or their trusts supplied written notice of cancellation to petitioners between the time of the Nov. 1979 conveyance until the Dec. 1981 reconveyance from the children to the petitioners-parents.↩
17. Under sec. 113(a)(5), I.R.C. 1939↩, (and some Revenue Act sections) the statutory language required valuation "at the time of acquisition." The United States Supreme Court and the United States Circuit Court of Appeals for the Eighth Circuit interpreted that language to mean the date of death of the grantor, rather than the time of the recipient's use or possession of the property. These court holdings followed respondent's regulations which more specifically referenced the date of death as the crucial date for purposes of valuation to determine the basis in the hands of a recipient of a property interest from a decedent, receipt of which was delayed.
18. Petitioners make no distinction between the Nov. 10, 1944, and Sep. 16, 1960, dates and apparently contend that the value would have been the same on both dates. This may be attributable to Charles' testimony that the value of limestone in place in the Cape Girardeau area has consistently been $ .03 to $ .05 per ton, depending upon the cost of the removal of the overburden. ↩
19. Petitioners' figure on brief apparently exceeds $584,430 because of use of a price higher than $ .03 per ton. During the trial petitioners offered several 1979 letters containing appraisals of the property in question for the year 1925. (Exhibit 38) The exhibit was received conditionally and respondent was permitted to further object and present his reasons upon brief. Respondent on brief argues that these letters (Exhibit 38) are hearsay and that petitioners did not bring the authors forward for cross-examination. We agree with respondent and the letters are not received for the truth of the matters stated, but are received merely to show petitioners' reliance upon them in the preparation of their 1979 Federal income tax return.↩
20. Respondent has also argued that the assessment values should be given weight in valuing the property in question because of their relationship to actual value. Respondent goes on to suggest that actual value of the property can be found in the compromise agreed to by Charles' maternal grandmother's estate, which respondent asserts was somewhat attributable to the valuations given to adjacent property by Internal Revenue Service valuation engineers. Respondent attempted to put this information in the record by means of a summary (Stipulation of Facts, paragraph 11h and Exhibit AG) and petitioners objected. Respondent argues that we should find this to not be hearsay and to be admissible evidence because it is not offered for the truth of the matters contained, and if it is hearsay that it should be received under the "ancient documents" exception. We find fault with respondent's positions because elements of paragraph 11h contain substantial hearsay and if we do not accept it for the truth of matter stated, we are not able to see of what value they would be in a probative sense. Furthermore, we cannot understand what respondent's recently created summary or the paragraph they recently offered in a stipulation for trial has to do with the ancient document exception within the meaning of Rule 803(16) of the Federal Rules of Evidence.↩ We hold that the proffered assessment values are not admissible based upon this record. Further, even if the local assessments were properly offered and received in evidence, we are without testimony of the assessor's office as to the method of assessment and other factors which would dictate the weight to be given to the assessment data, if any, in determining the value of the real property. For example, the assessor may have valued the property as vacant or farmland, because it may be the practice in that locality not to value it as a quarry unless it is being so used, even though there may be valuable mineral deposits available.
21. There is some question whether the top available layer of limestone in U.S. Survey 176 was plattin or peckatonica, but that seems to be of little import because Charles had actually refined limestone from the property for limited commercial purposes. (He had "burned" the limestone and sold it to local farmers for whitewash and agricultural purposes.) This use reflects that the limestone is of commercial quality. ↩
22. A Guidebook to the Geology Along Interstate-55 in Missouri, which was issued by the Missouri Department of Natural Resources, Division of Geology and Land Survey (1977), was received in evidence (Exhibit 37) and it contains the statement that the limestone thickness ranges from 100 to 400 feet along the described corridor, with specific mention of the Cape Girardeau area as being included. The guidebook describes the limestone as follows: "While not a high-calcium stone, the unit is suitable for cement manufacture and other industrial uses." p. 101. Although we do not rely upon this evidence as proof of a deposit on the subject property, it serves as support for Charles' opinion and reflects the potential for the existence of a 100-foot layer of commercial quality limestone.↩
23. The property was valued for farming purposes at over $1,000 per acre by the lender in connection with the 1973 loan obtained by petitioners.↩